*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0295p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CENTRA, INC.; DETROIT INTERNATIONAL BRIDGE CO.,

     *Plaintiffs-Appellants,*

   *v.*

DAVID ESTRIN; GOWLING LAFLEUR HENDERSON, LLP,

     *Defendants-Appellees.*

> No. 07-1680

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-15185—Nancy G. Edmunds, District Judge.

Argued: January 29, 2008

Decided and Filed: August 15, 2008

Before: MERRITT, DAUGHTREY, and MOORE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Craig L. John, DYKEMA GOSSETT, Bloomfield Hills, Michigan, for Appellants. Eugene Driker, BARRIS, SOTT, DENN & DRIKER, Detroit, Michigan, for Appellees. **ON BRIEF:** Craig L. John, Joseph A. Doerr, Thomas J. Murray, DYKEMA GOSSETT, Bloomfield Hills, Michigan, for Appellants. Eugene Driker, Sharon M. Woods, Kevin Kalczynski, Melonie L.M. Stothers, BARRIS, SOTT, DENN & DRIKER, Detroit, Michigan, for Appellees.

  MOORE, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. MERRITT, J. (p. 19), delivered a separate concurring opinion.

---

## OPINION

---

  KAREN NELSON MOORE, Circuit Judge. The Detroit International Bridge Company ("DIBC") and its Michigan-based parent CenTra, Inc. (collectively "CenTra"), believed that more divided them from Windsor, Ontario than united them. For one thing, the Detroit River separates Windsor from Michigan. For another, Windsor and CenTra disagreed as to the future of the Ambassador Bridge, the CenTra-owned bridge that spans the Detroit River; while CenTra sought to add a second span to the bridge, Windsor wanted to stop that expansion. Yet CenTra was wrong in concluding that more divided than united. It turns out that Windsor and CenTra were both

1

employing the same law firm, Gowling Lafleur Henderson, LLP ("Gowlings"): while Windsor hired Gowlings to help the city oppose the second span, CenTra hired Gowlings to help the company raise money to fund the construction of that same span. Although CenTra wanted to expand its connection to Windsor, it was hoping to do so with an additional bridge, not by sharing legal counsel; thus, CenTra sued Gowlings for damages, alleging breach of contract, breach of fiduciary duties, and legal malpractice. The district court granted summary judgment for Gowlings, holding that CenTra impliedly consented to any conflict of interest in Gowlings's simultaneous representation of adverse clients regarding the construction of the second span of the Ambassador Bridge. The district court found implied consent because it concluded that CenTra was aware that Gowlings had previously represented parties (including Windsor) directly adverse to CenTra in cases where Gowlings was not representing CenTra. We believe that the district court erred in its granting of summary judgment. CenTra established genuine issues of material fact regarding not only whether it impliedly consented to the conflict of interest, but also whether it could even consent to the conflict in the first instance. Furthermore, the district court abused its discretion in granting summary judgment prior to discovery. We, therefore, **REVERSE** the district court's judgment and **REMAND** the case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

"[T]he Ambassador Bridge (the 'Bridge') which spans between Windsor, Ontario and Detroit, Michigan is owned jointly by related parties of CenTra . . . ." Joint Appendix ("J.A.") at 246 (Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. at 3) (internal quotation marks omitted) (citation omitted). DIBC, along with its wholly-owned subsidiary, the Canadian Transit Company ("CTC"), "owns, operates and maintains the Ambassador Bridge, the busiest and single most important commercial border crossing between Canada and the United States." J.A. at 23 (First Am. Compl. ¶ 7). Dan Stamper is president of both DIBC and CTC.

Between 1985 and 2006, Gowlings had consistently represented CenTra in a variety of matters. "Gowlings is one of Canada's largest law firms, with eight offices throughout Canada and one in Moscow." J.A. at 83 (Defs.' Br. in Supp. of Mot. for Summ. J. at 3). Despite CenTra's longtime association with Gowlings, Gowlings's Toronto-office partner David Estrin ("Estrin") has occasionally taken adverse positions to CenTra. For example, in 2001, Estrin began to represent the Buffalo and Fort Erie Public Bridge Authority, and through that representation Estrin learned that CenTra planned to build a competing bridge in close proximity to the one that the Buffalo and Fort Erie Public Bridge Authority operated. In order to defend his client's interests, on May 22, 2003, Estrin wrote a letter to Stamper on Gowlings letterhead on behalf of the Buffalo and Fort Erie Public Bridge Authority. In that letter, Estrin declared of Gowlings that "[w]e are the solicitors for The Buffalo and Fort Erie Public Bridge Authority." J.A. at 113 (Letter from Estrin to Ambassador Bridge (May 22, 2003)). Estrin sent a letter to the same effect on September 9, 2004.

In 2002, Estrin accepted another client whose interests would soon turn adverse to CenTra: the City of Windsor. According to CenTra, Windsor has long worked to frustrate CenTra's plans, having "opposed and hindered the development, maintenance and operation of the Ambassador Bridge." J.A. at 27 (First Am. Compl. ¶ 34). Yet when Windsor first hired Estrin and Gowlings, it was to help the city resolve problems with the high volume of traffic from the Ambassador Bridge, a role not directly adverse to CenTra. According to Estrin, however, the "general representation of Windsor gradually turned adverse to CTC[, a CenTra subsidiary]." J.A. at 105 (Jan. 9, 2007, David Estrin Decl. ¶ 8). What prompted the turn toward adversity was CenTra's filing of two plans involving the Ambassador Bridge: "In June 2004, CTC applied to Windsor for site plan approval for more toll booths as well as a 'bridge deck extension' (the 'Site Plan []') for the existing Ambassador Bridge. A month later, CTC filed a Preliminary Review Permit Application . . . with

the United States Coast Guard for 'twinning' the Ambassador Bridge (the 'Bridge Plan')." J.A. at 105 (Estrin Decl. ¶ 9). "[T]winning" the Ambassador Bridge refers to building a second bridge (a twin) alongside the original.

Estrin, on behalf of Windsor, opposed the Site Plan but did not explicitly take a position as to the Bridge Plan. On September 14, 2004, Estrin sent a letter to Stamper in response to the Site Plan, and the letter included notice of Gowlings's role: "[a]s you know, we are the solicitors for the City of Windsor concerning this matter." J.A. at 165 (Letter from Estrin to Stamper (Sept. 14, 2004)). Estrin and Gowlings's involvement in opposing CenTra's Site Plan was even clearer to CenTra on September 30, 2004, when Windsor officials, Estrin, Stamper, and other CenTra representatives met to negotiate a resolution regarding the Site Plan.

Estrin believed that the Bridge Plan and the Site Plan were directly related; therefore, Estrin claims that his opposition to the Site Plan also served as opposition to the Bridge Plan. Stamper, however, viewed the Site Plan as a matter totally separate from the Bridge Plan: "The Plaza Deck Expansion has absolutely nothing to do with and is not part of or dependent upon the development of DIBC's proposal to build a second span at the Ambassador Bridge . . . ." J.A. at 274 (Mar. 9, 2007, Dan Stamper Decl. ¶ 5). Whether or not the parties initially believed that the Site Plan and Bridge Plan were related, the Site Plan settlement between CenTra and Windsor explicitly disentangled the two plans:

> The Corporation [Windsor] confirms and the Owner [CenTra] acknowledges that the Corporation's approval of the development contemplated by the subject site plan application does not constitute an endorsement by the Corporation of the proposal by the Owner to twin the existing Ambassador Bridge as proposed in the Owner's July 14, 2004 Preliminary Review Permit Application, or a waiver by the Corporation of the Corporation's right to require an Official Plan/Zoning By-law amendment or otherwise object to or deny the Corporation's approval for a second Ambassador Bridge span or twinning (including any works or undertakings required or to be used for the purpose), nor shall the Corporation's approval of the development contemplated by the subject site plan application or any associated or corollary approval or agreement be pleaded as an estoppel of the Corporation in that regard.

J.A. at 124-25 (Site Plan Control ¶ S-21).

Furthermore, in 2005 and 2006, Estrin defended against CenTra's objections Windsor's proposed regulations regarding transportation infrastructure, which specifically mentioned the Ambassador Bridge as subject to the regulations. Thus, CenTra was aware that Gowlings and Estrin were representing Windsor's adverse interests in several matters in which Gowlings was not representing CenTra, but CenTra allegedly was not aware of any of Gowlings's and Estrin's work on behalf of Windsor in opposing the Bridge Plan.

Despite awareness of Gowlings's occasional representations of other clients with interests adverse to CenTra, CenTra continued to employ Gowlings, which had been one of its law firms for over twenty years. For instance, in June 2005, Stamper sought Gowlings's assistance in certain tax work. Before accepting the work, a Gowlings attorney searched for any potential conflicts of interest but did not identify any. Then again, most importantly for the case at hand, in November 2005, CenTra sought Gowlings's assistance in creating a $700- to $800-million bond offering by which to finance the twinning of the Ambassador Bridge. Shortly thereafter, Windsor employed Gowlings to help the city oppose the Bridge Plan. On September 14, 2006, Estrin sent a letter to the U.S. Coast Guard opposing the construction of the twin bridge. According to CenTra, as a result of Estrin's letter, the Coast Guard demanded an environmental assessment from CenTra that will

cost CenTra $500,000 on the United States side of the bridge and $300,000 on the Canadian side. Thus, by September 2006, Gowlings was simultaneously helping CenTra procure funding for the bridge expansion and assisting Windsor in trying to halt the bridge expansion.

Both CenTra and Gowlings claimed ignorance as to this conflict of interest. According to Stamper: "I was not aware that Gowlings was representing Windsor in opposition to the Second Span until September, 2006, when I saw Mr. Estrin's letter to the U.S. Coast Guard . . . opposing the Second Span." J.A. at 275 (Stamper Decl. ¶ 7). Estrin claimed to be even more clueless: "Until a few weeks before Centra filed this lawsuit, I was completely unaware that Centra, DIBC, or CTC had retained Gowlings on any other matter. At no time have I had communications with anyone associated with Gowlings about any work that they may have done on behalf of Centra, DIBC or CTC." J.A. at 107 (Estrin Decl. ¶ 20).

Despite Estrin's assertions that he knew nothing about Gowlings's prior work for CenTra, CenTra alleged in its lawsuit that Estrin may have possessed a legal memorandum that had been previously prepared for CenTra. Between 1979 and 1992, CenTra was engaged in lengthy litigation with Canada regarding the ownership and possession of the Canadian half of the bridge. During the course of this litigation, Gowlings acquired extensive information regarding CenTra and the Ambassador Bridge:

> In the course of Gowlings serving as the Companies' representative before CRA [Canada Revenue Agency] with respect to the Controversies, the Companies revealed detailed, confidential financial and operational information about the Ambassador Bridge and shared other confidential information about the Companies efforts to preserve and enhance the value of their franchise to own and operate the Ambassador Bridge and be in a position to expand and/or replace that Bridge when necessary to meet competitive threats posed by other border crossing facilities.

J.A. at 353 (Mar. 7, 2007, Fred Calderone Decl. ¶ 6). Of particular interest was a memorandum that the firm of Goodman & Goodman created "that compiled all of the documents, both public and private, that Goodman & Goodman believed to be the documents proper and relevant to the defense of [CenTra] to an encroachment upon their ownership and control by the City of Windsor, the Province of Ontario and the Dominion of Canada." J.A. at 284 (Mar. 8, 2007, Patrick A. Moran Decl. ¶ 4). Although a different law firm prepared the memorandum, CenTra provided to Gowlings the Goodman Legal Memorandum and all of its supporting documents. This collection of materials, according to CenTra, is very similar to the research that Estrin described in his letter to the U.S. Coast Guard.

## B.  Procedural Background

On November 20, 2006, CenTra filed a diversity action against Estrin and Gowlings in the U.S. District Court for the Eastern District of Michigan. On December 7, 2006, CenTra filed its first amended complaint. The amended complaint sought relief for breach of contract, breach of fiduciary duties, and legal malpractice, all stemming from Gowlings's simultaneous and adverse representation of both CenTra and Windsor.

Before any opportunity for discovery, Gowlings requested summary judgment as well as dismissal. CenTra filed a Federal Rule of Civil Procedure 56(f) motion requesting that the district court first allow an opportunity for discovery:

> The two motions cite and rely upon 21 exhibits, almost all of which fall outside of the pleadings. Part of these 21 exhibits are 4 affidavits containing numerous factual allegations that are highly disputed by Plaintiffs. Defendants, without the Plaintiffs having the opportunity to depose the affiants, much less having the benefit of any

discovery, would have this Court accept these allegations as true, accurate and undisputed.

J.A. at 194 (Pls.' Mot. to Conduct Disc. at 2). On February 16, 2007, the district court denied CenTra's motion to conduct discovery. When CenTra asserted that a total lack of discovery left it with the evidentiary equivalent of a half deck of cards, the district court responded that "I don't think there is an adequate showing under Rule 56(f) to permit discovery. It seems to me like you've got at least your two aces plus a lot of other cards up your sleeve, and I'm going to require that you file a response." J.A. at 610 (Feb. 16, 2007, Mot. to Conduct Disc. Hr'g at 18:5-9).

On April 30, 2007, the district court granted Gowlings's motion for summary judgment. According to the district court, "Plaintiffs confine their lawsuit to [Michigan Rules of Professional Conduct] § 1.7(a)(2), and argue that Defendants did not properly obtain Plaintiffs' consent regarding this conflict. While not necessarily applying Michigan law, a number of courts have recognized that the client may impliedly waive its consent to an attorney's conflict of interest." J.A. at 589 (Apr. 30, 2007, Order Granting Summ. J. at 6). Determining that it was legally possible for CenTra to waive any objections to Gowlings's conflict of interest, the district court concluded that Stamper's continued retention of Gowlings effectuated waiver after years of notice regarding Gowlings's representations of other clients with interests adverse to CenTra:

> Although Stamper declares that he was unaware of Gowlings' representation of Windsor until September 2006, the Court finds that this testimony is fatally inconsistent with the uncontested facts regarding the September 2004 letter to Stamper, the meeting later that month where the parties discussed the Site Plan, which he and Defendant Estrin both attended, and the resulting February 2005 Site Plan agreement that also mentioned the Bridge Plan.

J.A. at 590-91 (Order at 7). Because the conflict was waived, the district court granted summary judgment in favor of Gowlings. The district court's order made no mention of CenTra's claims regarding Gowlings's use of confidential material.

On May 29, 2007, CenTra filed a timely notice of appeal.

## II. ANALYSIS

### A. The Grant of Summary Judgment

#### 1. The Applicable Law

In diversity cases we apply the choice-of-law rules and substantive law of the forum state, which is Michigan in this case. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). The issues before us touch on matters of professional responsibility, suggesting some important questions as to the appropriate choice of law for this case. Under similar circumstances, we have applied the forum state's professional-conduct standards in a diversity-based malpractice action. *Woodruff v. Tomlin*, 616 F.2d 924, 935-36 (6th Cir.) (en banc), *cert. denied*, 449 U.S. 888 (1980). However, we need not resolve the exact question of what Michigan's choice-of-law principles would indicate as the applicable standards of professional conduct because, for the issues we must address today, Michigan's standards of professional conduct are consistent with the other possible sources of law, making any asserted conflict of laws a false conflict. *Williams v. Toys "R" Us*, 138 F. App'x 798, 803 (6th Cir. 2005) (unpublished). For instance, the U.S. District Court for the Eastern District of Michigan has adopted the Michigan Rules of Professional Conduct as the applicable federal rules of professional conduct. *See* U.S. District Court for the Eastern District of Michigan, Local Rule 83.22(b). In addition, the Restatement (Third) of the Law Governing Lawyers ("Restatement") and the 2007 edition of the American Bar Association's ("ABA's") 1983 Model Rules of Professional

Conduct ("ABA Model Rules") are consistent with Michigan's Rules of Professional Conduct in all respects that now appear relevant for this case. Thus, we will apply the Michigan Rules of Professional Conduct, and we will look to the ABA Model Rules and Restatement to provide elaboration.

At oral argument, Gowlings's counsel asserted that Michigan's standards of professional conduct do not apply to this case. He claimed that, because this was a civil action and not a disciplinary matter, the Michigan Rules of Professional Conduct have no bearing on the question of whether the district court correctly granted summary judgment. Gowlings's counsel is correct that a violation of Michigan's Rules of Professional Conduct does not by itself give rise to an actionable claim. The Michigan rules state:

> Failure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process. *The rules do not, however, give rise to a cause of action for enforcement of a rule or for damages caused by failure to comply with an obligation or prohibition imposed by a rule.*

MICH. R. PROF'L CONDUCT 1.0(b) (emphasis added).[1] CenTra, however, does not assert that Gowlings's alleged violations of the Michigan Rules of Professional Conduct are themselves actionable; instead, CenTra asserts claims of breach of contract, breach of fiduciary duties, and legal malpractice.

Although Rule 1.0(b) makes it clear that a plaintiff cannot seek damages for a violation of the Michigan Rules of Professional Conduct, a violation of the rules may be probative in establishing an independent cause of action. For instance, the Michigan Court of Appeals considered the Michigan Rules of Professional Conduct in a civil contract action that determined that a fee agreement was unenforceable. *Evans & Luptak, PLC v. Lizza*, 650 N.W.2d 364 (Mich. Ct. App. 2002). The court in *Evans & Luptak* stated that although "[t]he rules do not . . . give rise to a cause of action for enforcement of a rule or for damages caused by failure to comply with an obligation or prohibition imposed by a rule," the rules are still admissible and relevant under "the Michigan Rules of Evidence and other provisions of law." *Id.* at 368. Subsequent Michigan Court of Appeals cases have embraced this position and have approved of the use of the Rules of Professional Conduct when the "plaintiffs do not rely solely on the rules to establish their claim, but instead refer to the rules only as evidence of the standard of care," *Recker v. Malson*, No. 268230, 2006 WL 2380960, at *3 (Mich. Ct. App. Aug. 17, 2006) (unpublished), and have allowed juries to be instructed as to those rules in such cases, *Deluca v. Jehle*, No. 266073, 2007 WL 914350, at *3 (Mich. Ct. App. Mar. 27, 2007) (unpublished). We believe that it is clear that the rules are probative and instructive for the instant case, particularly as they relate to CenTra's malpractice and fiduciary-duty claims.[2]

---

[1] In 1988, the Michigan Supreme Court adopted the Michigan Rules of Professional Conduct, which were "largely drawn from the American Bar Association's Model Rules of Professional Conduct." MICH. R. PROF'L CONDUCT 1.0 cmt.

[2] At oral argument, Gowlings suggested that we follow the lead of the Tennessee Supreme Court and hold that rules of professional conduct are inapplicable in civil actions. A review of Tennessee rulings, however, reveals nothing contradictory to our position, and we must, therefore, disagree with Gowlings's counsel's representations regarding Tennessee precedent. The Tennessee Supreme Court held that evidence that a lawyer violated the Code of Professional Responsibility "is not *sufficient* evidence to present an issue of fact for the jury," *Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.*, 813 S.W.2d 400, 407 (Tenn. 1991) (emphasis added), but the court also stated in the same case that "the standards stated in the Code are not irrelevant in determining the standard of care in certain actions for malpractice." *Id.* at 405. Just as Michigan courts have done, lower Tennessee courts have rejected claims whose *sole* basis is a violation of the Rules of Professional Responsibility, *see, e.g.*, *Akins v. Edmondson*, 207 S.W.3d 300, 307-08 (Tenn. Ct. App. 2006); *Image Outdoor Adver., Inc. v. CSX Transp., Inc.*, No. M2000-03207-COA-R3-CV, 2003 WL 21338700,

CenTra's claims rely upon Michigan's Rules of Professional Conduct as evidence of the appropriate standard of care, not as causes of action themselves. CenTra first alleges a breach of contract. Although one Michigan appellate panel has suggested that violations of the Michigan Rules of Professional Conduct cannot "normally constitute a breach of contract," *Biedul v. Jay N. Siefman, P.L.L.C.*, No. 263736, 2006 WL 3375317, at *3 (Mich. Ct. App. Nov. 21, 2006) (unpublished), CenTra's claim is not that narrow. CenTra not only alleges that Gowlings's conflict of interest breached its contract to represent CenTra zealously (without reference to Michigan's professional-conduct rules), J.A. at 28 (First Am. Compl. ¶¶ 41, 43), but also alleges that Gowlings's use of confidential information violated the parties' agreements, J.A. at 28 (First Am. Compl. ¶ 44). Although it would seem to us that a breach-of-contract claim, even if factually premised upon a conflict of interest, does not rely upon the Michigan Rules of Professional Conduct as a cause of action, we need not determine the full reach of *Biedul*'s holding because the latter allegation regarding the use of confidential information is certainly not dependent upon a violation the Michigan Rules of Professional Conduct. Similarly, CenTra's claim of breach of fiduciary duties made no mention of Gowlings's obligations under Michigan's Rules of Professional Conduct. Lastly, CenTra's legal-malpractice claim was grounded in Gowlings's alleged failure "to act as a reasonable attorney would have acted," J.A. at 29 (First Am. Compl. ¶ 56).[3] CenTra raised Michigan's Rules of Professional Conduct only in response to Gowlings's motion for summary judgment, which had asserted that CenTra waived the conflict of interest. *See* J.A. at 257 (Pls.' Br. in Opp. to Defs.' Mot. for Summ. J. at 14).

CenTra's complaint asserts claims of breach of contract, breach of fiduciary duties, and legal malpractice. These claims are not dependent upon a violation of the Michigan Rules of Professional Conduct; tort law and contract law provide the legal basis for the claims, not rules of professional ethics. *See Lazy Seven Coal Sale*s, 813 S.W.2d at 405. The professional-conduct rules assist in evaluating CenTra's claims, but they do not provide the underlying elements of the claims themselves. Thus, CenTra appropriately uses Michigan's Rules of Professional Conduct as support for its claims, not the basis of the claims, and we will proceed to evaluate the district court's grant of summary judgment.

We review a district court's grant of summary judgment de novo. *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007). The Federal Rules of Civil Procedure state that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(c). We have observed that:

> The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by 'showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted). In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, the facts and any

---

at *10 (Tenn. Ct. App. June 10, 2003) (unpublished) (noting that they "have found no Tennessee case recognizing . . . [a] cause of action [based on breach of fiduciary duty] against a lawyer for conduct *based exclusively on an alleged violation* of the Code of Professional Responsibility" (emphasis added)).

[3] CenTra did reference the Law Society of Upper Canada's Code of Ethics, J.A. at 30 (First Am. Compl. ¶ 57), not as a cause of action in itself, but only to note that Gowlings's actions that violated its general duty to CenTra also ran afoul of the Law Society of Upper Canada's Code of Ethics.

inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). It is an error for the district court to resolve credibility issues against the nonmovant: "In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. The district court errs by granting summary judgment for the defendant where issues of credibility are determinative of the case." *Ctr. for Bio-Ethical Reform*, 477 F.3d at 820 (internal quotation marks and citation omitted).

## 2. Nonconsentable[4] Conflicts

There are some conflicts of interest to which a client may not consent. Thus, the district court was only partially correct when it stated "that a client may impliedly waive its consent to an attorney's conflict of interest," J.A. at 589 (Order at 6), because it ignored the question of whether Gowlings's simultaneous and adverse representation of CenTra and Windsor was in fact a conflict to which CenTra could consent. We hold that there is a genuine issue of material fact as to whether Gowlings's conflict of interest with regards to the Bridge Plan was one to which CenTra could consent.[5]

The Michigan Rules of Professional Conduct state that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation." MICH. R. PROF'L CONDUCT 1.7(a).[6] This rule has particular salience when the attorney is representing both sides in the same conflict; "[i]t is a well-established ethical principle that an attorney owes undivided allegiance to a client and usually may not represent parties on both sides of a dispute." *Evans & Luptak*, 650 N.W.2d at 370 (internal quotation marks omitted) (finding a conflict nonconsentable under Michigan Rule of Professional Conduct 1.7(a)(1) when an attorney advocated the filing of a wrongful-death lawsuit against one client on behalf of another).

---

[4] The litigants and the district court used the word "waive," but the various rules of professional conduct are typically written in terms of "consent." The litigants are not making a separate argument, but they are instead equating waiver and consent: the giving of consent serves to waive any objections to the conflict of interest. The cases themselves sometimes use the terms together or interchangeably. *See, e.g.*, *City of Kalamazoo v. Mich. Disposal Serv. Corp.*, 125 F. Supp. 2d 219, 243 (W.D. Mich. 2000) ("A client may expressly or impliedly waive his objection and consent to the adverse representation.").

[5] In reaching this conclusion, as well as reaching the other conclusions that follow, we rely heavily upon the Michigan Rules of Professional Conduct, the ABA Model Rules, and the Restatement. As we stated earlier, these rules can serve as evidence supporting various independent causes of actions even though they do not constitute causes of action in themselves. CenTra's complaint asserts claims of breach of contract, breach of fiduciary duties, and legal malpractice, yet the district court in its opinion and both sides' briefs on appeal do not address CenTra's underlying claims and instead focus entirely on professional-conduct standards. Because rules of professional conduct were the sole basis of the district court's grant of summary judgment, we focus our discussion on professional-conduct standards and reverse the district court's grant of summary judgment on the basis of those standards. However, we emphasize that, ultimately, this case is not premised on violations of the Michigan Rules of Professional Conduct, but is instead about claims of breach of contract, breach of fiduciary duties, and legal malpractice.

[6] We focus upon Rule 1.7(a) instead of Rule 1.7(b) because Rule 1.7(a) is specific to conflicts involving directly adverse clients, whereas Rule 1.7(b) is more general.

That CenTra[7] and Windsor are not directly adverse parties in a *lawsuit* is not determinative. Without a doubt, the ethical concerns would be greater if Gowlings were representing both sides in the same lawsuit. *See* RESTATEMENT § 122 cmt. g(iii) & illus. 8 ("When clients are aligned directly against each other in the same litigation, the institutional interest in vigorous development of each client's position renders the conflict nonconsentable."). However, according to the Restatement, representing both sides of a matter that is not in litigation can make a conflict of interest nonconsentable if the differences between the wrangling parties are large enough. *See* RESTATEMENT § 122 illus. 10. The ABA takes a similar approach in its model rules: "Whether a conflict is nonconsentable depends on the circumstances. For example, a lawyer may not represent multiple parties to a negotiation whose interests are fundamentally antagonistic to each other . . . ." ABA MODEL RULES, Rule 1.7 cmt. 28.

The district court broadly stated that a client may consent to a conflict of interest; however, it is not true that all conflicts are consentable. Whether a conflict is consentable depends upon the facts of the case. According to the commentary to Michigan's Rule 1.7, a conflict is nonconsentable "when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances." MICH. R. PROF'L CONDUCT 1.7 cmt. Given the evidence presented at the summary-judgment stage of this case, we hold that there is a genuine issue of material fact as to whether Gowlings reasonably believed that the conflict would not adversely affect its relationship with its clients, and whether a disinterested lawyer would conclude that CenTra should agree to the representation. CenTra submitted to the district court a declaration from an expert who stated that "I simply do not see how a law firm can offer sound professional service *simultaneously* to a client it is helping to build a bridge *and* to a client it is helping to block or delay construction of the bridge. This is not even a close question." J.A. at 375 (Mar. 9, 2007, Bruce L. Hay Decl. ¶ 33). Thus, CenTra presented a genuine issue of material fact as to whether this conflict was one to which it was capable of giving consent, and the district court's grant of summary judgment was erroneous.

### 3. Informed Consent

Even if we agreed with the district court that there was no question as to whether a client could consent to a conflict when one law firm represents both the party trying to build a bridge and the party trying to oppose it, we also believe that the district court erred in concluding that there was no genuine issue of material fact as to whether CenTra consented to the conflict. Michigan allows a client to consent to a conflict only if the consent is informed, and here there is a triable factual question as to whether CenTra was informed sufficiently of the conflict to provide consent.

According to Michigan's Rules of Professional Conduct:

A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
> (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> (2) each client consents after consultation.

MICH. R. PROF'L CONDUCT 1.7(a). While Michigan's language is not identical to the Restatement or the ABA Model Rules, the two national models bear significant similarity to Michigan's rules and give context to Michigan's standards. The Restatement advises:
> (1) A lawyer may represent a client notwithstanding a conflict of interest prohibited by § 121 if each affected client or former client gives informed consent to the

---

[7] It does not matter, for purposes of a conflict-of-interest issue, whether Gowlings was representing one CenTra subsidiary or another; according to the Restatement, a conflict as to one subsidiary is a conflict as to the entire corporation. *See* RESTATEMENT § 121 illus. 6 (2000).

lawyer's representation. Informed consent requires that the client or former client have reasonably adequate information about the material risks of such representation to that client or the former client.

(2) Notwithstanding the informed consent of each affected client or former client, a lawyer may not represent a client if:

    (a) the representation is prohibited by law;

    (b) one client will assert a claim against the other in the same litigation; or

    (c) in the circumstances it is not reasonably likely that the lawyer will be able to provide adequate representation to one or more of the clients.

RESTATEMENT § 122. The ABA Model Rules also provide similar guidance for attorneys:

Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

    (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

    (2) the representation is not prohibited by law;

    (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

    (4) each affected client gives informed consent, confirmed in writing.

ABA MODEL RULES, Rule 1.7(b). Although the three systems have some semantic variations, they are all similar in one important respect: Michigan requires "consent[] after consultation," and the ABA Model Rules and the Restatement require "informed consent." Although the ABA sets the bar even higher by requiring that consent be written, the common denominator for all three is the idea of consultation (informing) before consent.

This similarity between "informed consent" and "consent[] after consultation" is important because we could find little that elaborates upon what satisfies "consent[] after consultation" under Michigan law. In contrast, the Restatement and the ABA Model Rules provide more guidance. The Restatement requires that attorneys inform their clients of the nature of the conflict so that the clients are "aware of the material respects in which the representation could have adverse effects on the interests of that client." RESTATEMENT § 122 cmt. c(i). According to the Restatement, what is "material" may change with the circumstances. For instance, a client already represented by a disinterested attorney may require less information from the conflicted attorney, but the client "nevertheless may have need of information adequate to reveal [the conflict's] scope and severity." *Id*. Under the ABA Model Rules, a conflicted attorney does not need to disclose "facts or implications already known to the client or other person; nevertheless, a lawyer who does not personally inform the client or other person assumes the risk that the client or other person is inadequately informed and the consent is invalid." ABA MODEL RULES, Rule 1.0 cmt. 6. Thus, providing to the client anything less than full information runs the risk that the client is inadequately informed, thereby making any consent invalid.

In the case at bar, Gowlings argues that the lengthy history of its partner Estrin's opposition to CenTra, including Estrin's work on behalf of the Buffalo and Fort Erie Public Bridge Authority and for Windsor on the Site Plan, was sufficient to inform CenTra of a general, ongoing conflict of interest between Gowlings's other clients and CenTra. According to Gowlings, because CenTra had notice of a general conflict, CenTra's continued retention of Gowlings as its counsel served as implicit consent to future conflicts of interest that would include Gowlings's work on behalf of Windsor to oppose the Bridge Plan while simultaneously assisting CenTra in arranging for funding for the Bridge Plan.

We conclude that CenTra's knowledge of Estrin's prior work representing parties adverse to CenTra in different matters is not enough, as a matter of law, to inform CenTra adequately of the scope of Gowlings's conflict of interest regarding the Bridge Plan. Courts interpreting the ABA and Restatement rules have made it clear that it is not sufficient to leave the client to infer the full nature of a conflict from only bits and pieces of actual or constructive knowledge. The Ninth Circuit held that simply possessing knowledge of the existence of a conflict does not mean that the client is fully informed as to the conflict's implications:

> To satisfy the requirement of full disclosure by a lawyer before undertaking to represent two conflicting interests, *it is not sufficient that both parties be informed of the fact that the lawyer is undertaking to represent both of them*, but he must explain to them the nature of the conflict of interest in such detail so that they can understand the reasons why it may be desirable for each to have independent counsel, with undivided loyalty to the interests of each of them.

*Unified Sewerage Agency v. Jelco Inc.*, 646 F.2d 1339, 1345-46 (9th Cir. 1981) (internal quotation marks omitted) (emphasis added). Similarly, the Second Circuit rejected the argument that it was enough that the client knew generally of the conflicted attorneys' adverse work: "This assertion is without merit. Clause (C) of DR 5-105 [of the 1969 ABA Model Code[8]] specifically imposes upon an attorney the burden of affirmatively providing disclosure and obtaining consent. Clearly, full and effective disclosure of all the relevant facts must be made and brought home to the prospective client." *Int'l Bus. Machs. Corp. v. Levin*, 579 F.2d 271, 282 (2d Cir. 1978) (upholding disqualification of a law firm in an antitrust lawsuit after determining that the law firm failed to make an adequate disclosure when it was representing the plaintiff in the antitrust suit against IBM while also representing IBM in unrelated labor matters). To put it another way, "[i]t is doubtful that passing conversations at cocktail parties and in hallways is what the drafters of the ABA Model Code had in mind when they stated in DR 5-105(C) that 'full disclosure' is required." *Ransburg Corp. v. Champion Spark Plug Co.*, 648 F. Supp. 1040, 1046 (N.D. Ill. 1986) (disqualifying a law firm from a patent-infringement lawsuit after the law firm filed a lawsuit on behalf of one client against another client it was simultaneously representing on unrelated matters).

Gowlings repeatedly claims that the district court correctly focused on whether CenTra was aware of a general conflict rather than asking whether CenTra was aware of Gowlings's opposition to the Bridge Plan per se. *See, e.g.*, Appellee Br. at 27. In other words, Gowlings contends that knowledge of earlier conflicts can constitute knowledge sufficient to consent to a different, subsequent conflict. We disagree; the "informed" part of informed consent is tied to knowledge of the conflict in question, not different conflicts.[9] "Effective client consent to one conflict is not necessarily effective with respect to other conflicts or other matters." RESTATEMENT § 122 cmt. c(i)

---

[8] Rule DR 5-105(C) of the 1969 Model Code of Professional Responsibility states that "a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." The 1969 Model Code is therefore similar to the current ABA Model Rules, which replaced the 1969 Model Code in 1983, with respect to the requirement of informed consent.

[9] It appears that under Michigan law a client may signal that she is aware that future conflicts may arise and can consent to those in advance through written agreement. Although such agreements would effectuate a general consent, the client is informed of the conflicts in general and consents in general. *See Mich. Disposal Serv. Corp.*, 125 F. Supp. 2d at 243; *Rymal v. Baergen*, 686 N.W.2d 241, 267 (Mich. Ct. App. 2004) (reversing the disqualification of counsel in a sexual harassment and retaliation lawsuit after holding that "consent after consultation" was satisfied by a written agreement that "anticipated the possibility of such a conflict"). In contrast, in the instant case, Gowlings wants us to infer general consent to any future conflicts from specific instances of informed knowledge with respect to conflicts involving different parties or different legal matters. In any event, this case does not involve consent to prospective conflicts in a written agreement.

& illus. 1; *cf.* ABA MODEL RULES, Rule 1.7 cmt. 14 (requiring consent to be determined on a client-by-client basis). When a law firm represents two clients who are adversaries in various legal matters, but the firm represents the clients only in matters where the clients are not opposing each other, "knowledge of the general nature and scope of the work being performed for each client normally suffices" to inform the clients of the conflict. RESTATEMENT § 122 cmt. c(i). The case at hand is not a case where the firm was working on only unrelated matters; instead, while trying to help one client, CenTra, procure funding for the Bridge Plan, Gowlings was working for another client, Windsor, to oppose the Bridge Plan. Gowlings was working for two adverse parties on the same matter, and for that clear-cut conflict, CenTra's general knowledge that Gowlings has previously represented parties with adverse interests to CenTra is not enough to inform CenTra adequately with regards to the direct conflict of interest in Gowlings's representation of two adverse clients on the Bridge Plan.

If the vague and general information that CenTra possessed regarding prior, different conflicts was enough, then the client would bear the burden of identifying and understanding the full scope of any conflict of interest. It is not the client, however, to whom the various codes of conduct have given this responsibility; "[t]he affirmative duty here rests not with [the clients] but with [the law firm] and its attorneys." *Ransburg Corp.*, 648 F. Supp. at 1046; *see also Dunton v. County of Suffolk*, 729 F.2d 903, 909 (2d Cir. 1984) (vacating a judgment against a client police officer in a civil rights action on the basis that he was prejudiced by his counsel's conflict of interest; the court stated that "[the client police officer] presumably knew little or nothing about the law of attorney conflicts and could not be expected to discern the nature of the conflict. He would naturally rely on his attorney to protect him."). One court has placed more of a burden on the client. *See Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1116 (D.N.J. 1993) (holding that it was sufficient that the client had "the knowledge necessary to *discern* these conflict of interest issues . . . ." (emphasis added)). However, we could find no other courts that have adopted this watered-down standard, which is contradictory to the standard used in one of the most frequently cited cases in this field: "[W]e think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976) (upholding disqualification of a law firm that was representing the plaintiff in an antitrust matter but had a partner who was representing the defendant in separate but "somewhat similar" litigation, *id.* at 1385).

A client's knowledge that his law firm has, on previous occasions, represented parties that opposed the client in different matters does not provide an adequate foundation for informed consent with respect to a current simultaneous representation of two adverse clients with opposing interests in a specific dispute. Gowlings does not claim that it provided to CenTra more specific information regarding the current conflict on which informed consent could have been based, because Gowlings itself admits that it was not aware until 2006 of the conflict with respect to the Bridge Plan. It is, therefore, apparent that CenTra has at least established a genuine issue of material fact as to whether Gowlings fulfilled its obligation to inform CenTra of the full nature of the conflict arising from Gowlings's simultaneous and adverse representation of CenTra and Windsor with regard to the Bridge Plan.

## 4. Implied Consent

Gowlings asserts that CenTra's continued retention of Gowlings after learning of prior, different conflicts served as implied consent to the later conflict of interest with regard to the Bridge Plan. However, as we have already noted, consent must be determined on a conflict-by-conflict basis. CenTra's continued retention of Gowlings between 2003 and 2005 may have served as consent to those earlier conflicts, but it certainly could not serve as consent to a conflict that had not yet occurred and of which CenTra was not informed. In addition, under Michigan law, in order to prove implied consent, the attorney must convincingly establish the client's knowledge as to the

specific conflict, something Gowlings has not done. Thus, summary judgment was improperly granted to Gowlings.

Gowlings is correct that generally a client may impliedly consent to an attorney's conflict of interest. However, CenTra has established a genuine issue of material fact regarding whether it did impliedly consent. Michigan law permits implied consent in certain circumstances. *Mich. Disposal Serv. Corp.*, 125 F. Supp. 2d at 243 (stating that "[a] client may expressly or impliedly waive his objection and consent to the adverse representation," but finding that a prospective contractual waiver did not waive the conflict of interest when counsel for a defendant in an earlier environmental civil suit now represented plaintiffs suing the former client in a related environmental civil suit). For elaboration of the Michigan rule, it is helpful to look at the Restatement:[10]

> The requirement of consent generally requires an affirmative response by each client. . . . In general, a lawyer may not assume consent from a client's silent acquiescence. However, consent may be inferred from active participation in a representation by a client who has *reasonably adequate information about the material risks of the representation after a lawyer's request for consent*.

RESTATEMENT § 122 cmt. c(i) (emphasis added). According to the Restatement, there must be both "reasonably adequate information" and "a lawyer's request for consent," but in the instant case Gowlings has established neither.

In the cases that have found implied consent, the reviewing court has found it clear that the impliedly consenting party was fully aware of the conflict and, armed with that knowledge, that party still took actions that are consistent only with consent. For example, in a Ninth Circuit case, the court declared it "well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right." *Trust Corp. of Mont. v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983). In that case, however, there was no question that the conflicted firm provided to the former client and the former client's new firm its entire file on the former client so that the former client could evaluate the depth of the conflict, yet the former client said nothing about the conflict for over two-and-a-half years. *Id.* at 86. Similarly, the U.S. District Court for the Northern District of Ohio said that "[i]t is axiomatic that the client's right to object to an attorney's allegedly adverse representation may be waived." *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F. Supp. 193, 205 (N.D. Ohio 1976), *aff'd*, 573 F.2d 1310, No. 77-3016 (6th Cir. Dec. 12, 1977) (unpublished). In that case, however, there was no question that Cleveland had been well aware of the conflict for which it was now trying to disqualify the opposing counsel. Prior to the antitrust case in question, the city sought the firm's assistance on a bond matter. The firm expressed reluctance to accept work from Cleveland because it was concerned about a potential conflict of interest with one of its long-standing clients, the Cleveland Electric Illuminating Company ("CEI"). The City of Cleveland was very aware of the firm's work for CEI, but the city "importuned" the law firm to assist the city, and the firm obtained "written assent" from the city. *Id.* at 201. These cases make it clear that a court may infer a client's consent only when it is clear that the client was fully aware of the conflict of interest before acquiescing to further representation.

Implied consent requires an informed client. A court can say that a client's actions can support solely the conclusion that the client has consented, but only in the limited circumstance that it is indisputably clear that the client was aware of the conflict. In this case, Stamper asserted that he was not aware of the conflict of interest as to the Bridge Plan until 2006. The district court found

---

[10] Referring to the ABA Model Rules is less helpful for this question because the ABA Model Rules require that consent be written. ABA MODEL RULES 1.7(a)(4). There was no written consent here.

Stamper's statement to be not credible because he had attended meetings where Gowlings's affiliation with Windsor was apparent as to other matters. As we have noted, Gowlings's prior work for the Buffalo and Fort Erie Public Bridge Authority and for Windsor on the Site Plan—matters that were different from the Bridge Plan—could not serve to inform CenTra of Gowlings's conflict of interest with regard to the Bridge Plan. Furthermore, in a motion for summary judgment, the district court cannot make credibility determinations against the nonmovant, and Stamper's statement deserved the benefit of the doubt as long as it was not totally implausible. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989). Thus, there is clearly a genuine issue of material fact as to whether CenTra's retention of Gowlings after learning of Gowlings's work for parties adverse to CenTra on other matters served as implicit consent to Gowlings's simultaneous and adverse work on the Bridge Plan for both CenTra and Windsor.

Taking the evidence in the light most favorable to the nonmoving party, we are compelled to conclude that the district court improperly granted summary judgment in favor of Gowlings. CenTra has established genuine issues of material fact as to whether the conflict was consentable, whether CenTra was properly informed of the conflict, and whether CenTra's actions indicated implied consent. Therefore, we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

## B. CenTra's Rule 56(f) Motion for Discovery

After Gowlings filed a motion for summary judgment, CenTra asked the district court for the opportunity to conduct discovery. Under the Federal Rules of Civil Procedure, a nonmovant may request additional discovery prior to the granting of summary judgment:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1)   deny the motion;
> (2)   order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
> (3)   issue any other just order.

FED. R. CIV. P. 56(f). The district court denied CenTra's motion, and we review the decision for abuse of discretion. *Vance ex rel. Hammons v. United States*, 90 F.3d 1145, 1149 (6th Cir. 1996) ("The non-movant bears the obligation to inform the district court of his need for discovery, however. This court reviews for abuse of discretion a claim that summary judgment was prematurely entered because additional discovery was needed, and the argument is not preserved for appeal unless it is first advanced in the district court.").

In determining whether there was an abuse of discretion, "[a] number of different factors are applicable to such claims, such as (1) when the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests." *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196-97 (6th Cir. 1995) (citations omitted), *cert. denied*, 517 U.S. 1157 (1996). Because CenTra was given no opportunity to conduct the discovery that would be necessary for CenTra to oppose Gowlings's summary judgment motion, we conclude that the district court abused its discretion in denying CenTra's Rule 56(f) motion.

Typically, when the parties have no opportunity for discovery, denying the Rule 56(f) motion and ruling on a summary judgment motion is likely to be an abuse of discretion. *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) ("It is well-established that the plaintiff must receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for

summary judgment."); *Vance*, 90 F.3d at 1149 ("Most significant to the conclusion we reach is the fact that *no* discovery was conducted before the motion for summary judgment was filed and decided."); *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231 (6th Cir. 1994) ("Yet we nevertheless conclude that summary judgment should not have been awarded until the plaintiffs were allowed some opportunity for discovery. . . . In the instant case, we find that the grant of summary judgment, absent *any* opportunity for discovery, is such a misuse."). However, as a general matter we have upheld the denial of Rule 56(f) motions when the court deems as too vague the affidavits submitted in support of the motion. *See Ball*, 385 F.3d at 720 ("It is not an abuse of discretion for the district court to deny the discovery request when the party 'makes only general and conclusory statements [in its affidavit] regarding the need for more discovery and does not show how an extension of time would have allowed information related to the truth or falsity of the [document] to be discovered.'" (quoting *Ironside v. Simi Valley Hosp.*, 188 F.3d 350, 354 (6th Cir. 1999)) (alterations in original)); *Cacevic v. City of Hazel Park*, 226 F.3d 483, 489 (6th Cir. 2000) ("Nowhere in the unsworn document did the Cacevics indicate to the district court what material facts [they] hope[d] to uncover and why [they] ha[d] not previously discovered the information." (alterations in original) (internal quotation marks omitted)). We have applied this rule and upheld the denial of Rule 56(f) motions on vagueness grounds even when the parties were given no opportunity for discovery. *See Emmons v. McLaughlin*, 874 F.2d 351, 359 (6th Cir. 1989). Similarly, we have affirmed the denial of Rule 56(f) motions when the parties were given insufficient time for discovery if "further discovery would not have changed the legal and factual deficiencies." *Maki v. Laakko*, 88 F.3d 361, 367 (6th Cir. 1996), *cert. denied*, 519 U.S. 1114 (1997). Thus, it is generally an abuse of discretion to deny a Rule 56(f) motion in the absence of *any* opportunity for discovery, but we have noted some limited exceptions to that rule. Those exceptions, however, do not apply in this case, and we conclude the district court abused its discretion in denying CenTra's Rule 56(f) motion.

In requesting time for discovery before determination of the summary judgment motion, CenTra filed an affidavit outlining the evidence that it would seek in discovery. We conclude that CenTra's affidavit is not too vague and identifies information sought by CenTra "essential to justify its opposition" to summary judgment. FED. R. CIV. P. 56(f). There are several issues for which the opportunity for discovery would have been important. For instance, CenTra asserts it would have sought discovery as to Gowlings's conflicts-check procedures and how those procedures were or were not applied during the course of events leading up to this case. This information would shed light on what Estrin knew or should have known at particular times with regard to Gowlings's work for CenTra and could create a genuine issue of material fact regarding Gowlings's and Estrin's failure to catch and alert CenTra to the conflict. And one specific area where discovery would have been particularly helpful involves CenTra's allegations about Gowlings's use of confidential information.

CenTra questions whether Estrin used CenTra's Goodman Legal Memorandum in preparing Estrin's letter on behalf of Windsor to the U.S. Coast Guard in opposition to CenTra's Bridge Plan. In his letter Estrin wrote that "Gowlings has commissioned extensive historical and archival research with respect to the statutory and executive approvals granted by the Congress of the United States and the Parliament of Canada to the Ambassador Bridge, as well as in respect of the specific plans, drawings and rights-of-way approved by officials of the federal government in the United States and Canada for the current Ambassador Bridge." J.A. at 44 (Letter from Estrin to Robert W. Bloom, Jr., Bridge Program Manager, Office of Commander, Ninth Coast Guard District (Sept. 14, 2006) at 10). Estrin's description sounds similar to the description of the memorandum's contents given by one of the memorandum's authors. *See* Docket No. 2:06-cv-15185, R. 23 at 4 (Mar. 12, 2007, Emilio S. Binavince Decl. ¶ 4) (describing the Goodman Legal Memorandum as containing "notes of the factual and legislative history of the statutes and executive actions governing the construction of the Ambassador Bridge in Canada and the United States, particularly the Canadian statute incorporating the Canadian Transit Company"). The Goodman-memorandum author went on to state that the

documents that Estrin referred to in his letter "would by necessity be included in the documents and materials that Gowlings had obtained from Centra during its representation of Centra." (Binavince Decl. ¶ 6). A declarant for CenTra who was familiar with both Estrin's letter and the Goodman Legal Memorandum stated that Estrin's description of his research "is an accurate description of the materials compiled, referred to and analyzed in the Goodman Legal Memorandum that I personally delivered to Gowlings." J.A. at 288 (Moran Decl. ¶ 18). CenTra also provided an expert who concluded that it was "undisputed that, as counsel for DIBC, Gowlings had access to the confidential information connected with the case," including the Goodman memorandum "that critically analyzed and documented DIBC's legal right to own and operate the bridge." J.A. at 368 (Hay Decl. ¶ 11).

For his part, Estrin denies that he used any confidential information from CenTra. "The letter that I sent to the United States Coast Guard on September 14, 2006 is not based on confidential and/or privileged information that was supplied by Centra to Gowlings. I have never had any such information in my possession." J.A. at 108 (Estrin Decl. ¶ 27). According to invoices, Estrin worked with Heritage Research Associates to locate the cited historical material. *See* J.A. at 459-63 (Letter from David McConnell, Heritage Research Assocs. Inc., to Estrin (Sept. 12, 2006)).

In its complaint, CenTra alleged that "Gowlings has further breached its obligations to Plaintiffs by using the confidential and privileged information provided by Plaintiffs in its representation of Windsor against DIBC." J.A. at 28 (First Am. Compl. ¶ 44). In response, Gowlings submitted a declaration that claimed that it no longer possessed the Goodman Legal Memorandum, which CenTra claims that Estrin used when drafting his letter to the U.S. Coast Guard. According to the declaration: "Other than the files related to the Tax and Bond Work, Gowlings does not have any files in its possession or control related to its prior representation of Centra." J.A. at 110-11 (Jan. 10, 2007, Karen Byrne Decl. ¶ 7). For CenTra effectively to challenge Gowlings's assertion, discovery would likely be essential.

According to the Michigan Rules of Professional Conduct, "a lawyer shall not knowingly . . . use a confidence or secret of a client to the disadvantage of the client." MICH. R. PROF'L CONDUCT 1.6(b). Similarly, the Michigan rules provide that "[a] lawyer may reveal . . . confidences or secrets with the consent of the client or clients affected, but only after full disclosure to them." MICH. R. PROF'L CONDUCT 1.6(c). The use of the word "secret" suggests that a lawyer may disclose information that originated in a confidential document when that information has subsequently become publicly known. The term "secret," however, is not defined.

Michigan Rule 1.9, governing the information that may be disclosed from work created on behalf of *former* clients, may shed some light on what material Rule 1.6 covers. According to Rule 1.9:

> A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>> (1)  use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, *or when the information has become generally known*. . . .

MICH. R. PROF'L CONDUCT 1.9(c) (emphasis added). Rule 1.9, by exempting information that is generally known, suggests that generally known information is similarly exempt from Rule 1.6's bar from disclosure. Such a position is also consistent with the position of Michigan's Standing Committee on Professional and Judicial Ethics. In a formal opinion, the committee ruled:

> For example, where the only information acquired by the lawyer was a copy of a filed complaint forwarded to the defense firm by the client, since a filed complaint

is, by its nature, both a public and a published document, there would thus be nothing confidential or secret.

State Bar of Michigan Standing Committee on Professional and Judicial Ethics, Formal Opinion Number R-4 (Sept. 22, 1989). On this basis, we conclude that documents or information that are public or published are not considered confidential under Michigan's Rules of Professional Conduct.

Our conclusion is consistent with the Restatement as well. "The definition [of confidential client information] includes information that becomes known by others, so long as the information does not become generally known." RESTATEMENT § 59 cmt. b. Furthermore, according to the Restatement, it does not matter that the attorney gathered the information while working for another client because generally known information "may be employed by a lawyer who possesses it in permissibly representing other clients." RESTATEMENT § 59 cmt. d. Instead, "[w]hether information is generally known depends on all circumstances relevant in obtaining the information. Information contained in books or records in public libraries, public-record depositories such as government offices, or in publicly accessible electronic-data storage is generally known if the particular information is obtainable through publicly available indexes and similar methods of access. Information is not generally known when a person interested in knowing the information could obtain it only by means of special knowledge or substantial difficulty or expense." *Id.*

Absent information developed through discovery, Estrin's letter appears to contain only generally known material. Gowlings presented to the district court invoices from an historical research organization establishing that Gowlings hired the group to conduct research from public sources, and Estrin's letter seems to rely upon that research. Discovery, however, might help CenTra identify what, if any, information in the Estrin letter was derived from confidential information from the Goodman Legal Memorandum.

To determine whether the district court abused its discretion in denying a Rule 56(f) motion, we look to several factors "such as (1) when the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests." *Plott*, 71 F.3d at 1196-97. CenTra was given no opportunity for discovery, which suggests under factors one and three that the district court abused its discretion. Furthermore, without an opportunity for discovery, factors four and five are simply not applicable. And finally, factor two also indicates that the district court abused its discretion because CenTra sought evidence that would establish genuine issues of material fact as to its claims of breach of contract, breach of fiduciary duties, and legal malpractice. Thus, the district court's denial of CenTra's Rule 56(f) motion for discovery was an abuse of discretion.

## C. Damages

Finally, Gowlings asserts in its brief that summary judgment was appropriate because CenTra cannot prove that it suffered any damages. Gowlings claims that Canada would have required CenTra to pay for an environmental assessment even if Estrin had not urged the U.S. Coast Guard also to demand an assessment. Gowlings's argument, however, is disingenuous. Estrin's letter urged the U.S. Coast Guard to demand an environmental assessment because, according to Estrin, Canada's environmental assessment was not adequate. J.A. at 43 (Estrin Letter at 9) ("In Canada, however, there are only a minimal prescribed requirements [sic] for this type of environmental examination."). Thus, on the basis of Estrin's own arguments, it is reasonable to assume that CenTra was forced to expend greater resources on a more robust environmental assessment than it would have if it were required to meet only Canada's standards.

### III. CONCLUSION

We hold that CenTra established genuine issues of material fact as to whether Gowlings's simultaneous and adverse representation of Windsor and CenTra on the Bridge Plan was a conflict to which CenTra could consent, whether CenTra was adequately informed of the conflict to the extent that CenTra could have consented, and whether CenTra in fact did consent. We, therefore, hold that the district court erroneously granted summary judgment to Gowlings on CenTra's claims of breach of contract, breach of fiduciary duties, and legal malpractice. We also hold that the district court abused its discretion in denying CenTra's Rule 56(f) motion for discovery. For these reasons, we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

---

**CONCURRENCE**

---

MERRITT, Circuit Judge, concurring. There is a jury demand in this case, and I concur that the case should be remanded to the district court for further discovery relating to the underlying causes of action. The record does not contain a written contract between the parties or documents explaining the reciprocal undertakings of the parties, but the parties are clearly in conflict about the nature of the legal representation and duties undertaken by Gowlings.

We reach no conclusion about the scope of liability, causation, damages, or whether there is in fact a plausible or valid breach of contract or other legal duties. In the absence of a complete record, it would be premature for us to make any findings or conclusions with regard to the underlying causes of action. Under the Seventh Amendment, the plaintiff is entitled to a jury trial on any disputed issues of material fact. After proper instructions, it will be up to the jury to determine the nature of the legal representation undertaken by the defendants and whether civil liability is foreclosed by the Michigan Rules of Professional Conduct stating that the Rules "do not . . . give rise to a cause of action . . . or for damages . . . ." The District Court should set the case for trial giving the parties a reasonable period of time to complete discovery.