RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0113p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

In re: BAYER HEATHCARE AND MERIAL LIMITED FLEA CONTROL PRODUCTS MARKETING AND SALES PRACTICES LITIGATION.

KEVIN SIMMS; ALAN RESNICK; NASHVILLE FARRELL; JOHN GREGG; MARK BLOOM; PAMELA J. CARTHEN; GARY RICHARDSON; CRYSTAL BOYKIN; MARGARITA BALLOVERAS; SALVADORE CHRISTINA, JR.; BETH POLLARD,

          *Plaintiffs-Appellants,*

    *v.*

BAYER HEATHCARE LLC; MERIAL LIMITED; MERIAL LLC; MERIAL INC.,

          *Defendants-Appellees.*

No. 13-3514

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:12-md-02319—Dan A. Polster, District Judge.

Argued: January 29, 2014

Decided and Filed: May 29, 2014

Before: SUTTON, McKEAGUE, and WHITE, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Paul M. De Marco, MARKOVITS, STOCK & DEMARCO, LLC, Cincinnati, Ohio, for Appellants. Gregory A. Castanias, JONES DAY, Washington, D.C., for Appellees. **ON BRIEF:** Paul M. De Marco, MARKOVITS, STOCK & DEMARCO, LLC, Cincinnati, Ohio, John R. Climaco, Scott D. Simpkins, Margaret M. Metzinger, CLIMACO, WILCOX, PECA, TARANTINO & GAROFOLI CO., LPA, Cleveland, Ohio, for Appellants. Gregory A. Castanias, JONES DAY, Washington, D.C., Judy Jarecki-Black, Ph.D., MERIAL LIMITED, Duluth, Georgia, John K. Sherk, Holly P. Smith, Molly S. Carella, SHOOK, HARDY &

1

BACON L.L.P., Kansas City, Missouri, Richard J. Bedell, Jr., Lisa B. Gates, JONES DAY, Cleveland, Ohio, J. Patrick Elsevier, Ph.D., JONES DAY, San Diego, California, Chad A. Readler, JONES DAY, Columbus, Ohio, for Appellees.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge.   This case involves multidistrict litigation focused on whether defendants Bayer and Merial falsely advertised their flea-and-tick products for pets.  In an effort to streamline the case, the district court framed the case as turning on a single issue, and crafted a case management plan in which Bayer and Merial would bear the initial burden of producing studies to substantiate their advertising claims.  After Bayer and Merial met their burden, the burden would shift to the plaintiffs to refute the studies, showing how the studies were unreliable, inaccurate, or incomplete.  The plaintiffs' failure to carry their burden would result in dismissal of the case.  The plaintiffs agreed to the case management plan, but then at the end of the process wanted to instead conduct discovery relating to issues besides the agreed-on dispositive issue.  The district court denied most of the plaintiffs' discovery requests, and granted summary judgment to Bayer and Merial.  For the reasons stated below, we affirm.

**I.**

This case involves various flea-and-tick products for dogs and cats that Bayer and Merial manufacture and market.  All of Merial's products and all but one of Bayer's products are considered "spot-on products" because their active ingredient works primarily through topical application to a pet's skin rather than through the pet's bloodstream.  According to Bayer and Merial, after a small amount of their product is applied to one area of a pet's skin, the product disperses over the rest of the pet's body within one day of application via a process called translocation.  Bayer and Merial advertise that this dispersal occurs because the product collects in the oil glands in the pet's skin, and that the pet's natural oils spread the product over the surface of the pet's skin and "wick" the product over the pet's hair.

The plaintiffs in this case are the named plaintiffs in ten actions filed in nine district courts, consolidated by the Judicial Panel on Multidistrict Litigation.  The plaintiffs allege that

Bayer and Merial made various false and misleading claims about their flea-and-tick products. In their briefing to this court, the plaintiffs summarize their false advertising claims against Bayer and Merial as follows:

> [1] that defendants' products are self-dispersing and cover the entire surface area of the pet's body when applied in a single limited spot; [2] that they are effective for one month and require monthly applications to continue to be effective; [3] that they do not enter the bloodstream of the pet and instead move across the pet's coat and skin to cover and protect the pet; [4] and that they are waterproof and remain effective following shampoo treatments, swimming, and exposure to rain or sunlight.

Pl. Br. at 7.

On May 1, 2012, the district court conducted a case management conference. The district court discussed the plaintiffs' claims with the plaintiffs' attorneys, noting that the "first alleged false claim is that the defendants' products are self-dispersing and cover the entire surface of the dog or cat's body when applied in a single limited spot." R. 16, 05/01/12 Tr. at 12, PageID # 187. After discussing all four claims with the plaintiffs' attorneys, the district court reasoned that there were "four claims, but there's really only one claim. . . . We can tie everyone up for years in discovery, but we can cut through all that and do a couple tests, and the product either disperses or it doesn't." *Id.* at 35, PageID # 210. The district court also noted that "if this product didn't work [the way that the defendants claimed that it worked,] it would be readily apparent . . . within a few months." *Id.* at 13, 15, PageID # 188, 190.

The district court summarized the dispute as a one-issue case several times during the case management conference. On one occasion, the district court stated, "boiled down, this case is very straightforward. The plaintiffs are alleging that the defendants' product does not autodisperse across the surface of the pet's body as the defendants claim." *Id.* at 42–43, PageID # 217–18. On another occasion, the court stated: "It's taken an hour, I now understand the plaintiffs' case . . . it boils down to one basic contention, that they're claiming that [Bayer and Merial] have misrepresented [their] product. And that is this self-dispersing mechanism, and that it covers the pet's body, entire body, with a single application. So that's what it boils down to." *Id.* at 44, PageID # 219. On a third occasion: "So the question simply is, does this product . . . translocate over the pet's body. If it does there is no case, if it doesn't you have a problem with

what you're claiming, you have to stop claiming it." *Id.* at 52, PageID # 227.   In another exchange, the plaintiffs expressly agreed with the district court's categorization of the case:

> JUDGE POLSTER: . . . . This is a one-issue case.  Okay? I mean, does this product disperse over the pet's body?  If it does, there's no case.  If it doesn't, we've got a false representation.  That's it. I mean, and it's false for everyone, because that's the only reason you would get the product.  If it only works on the pet's neck, who cares, it's worthless.
>
> MR. CLIMACO [counsel for plaintiffs]: Your Honor, we agree.  That's the basic simplicity of the case.

*Id.* at 32, PageID # 207.

The district court then crafted an evidentiary plan for handling the case.  In so doing, the district court again expressed concerns about spending millions of dollars in discovery.  The evidentiary plan was discussed as follows:

> JUDGE POLSTER: If [Bayer and Merial have] a good study . . . it will be up to the plaintiffs to demonstrate conclusively to me through experts what's wrong with your study, or else they're out.  I'll dismiss the claim, and they can go to the Court of Appeals, and then they're not going to succeed.  Okay?  That will be as a threshold matter.  If . . . [Bayer and Merial produce the study,] then it's up to the plaintiffs to show why [the] study was inadequate, incomplete, false, fraudulent, whatever they want to say, through some expert, . . .
>
> So do plaintiffs agree with that?
>
> MR. CLIMACO [counsel for plaintiffs]: Yes, we do, Your Honor.

*Id.* at 48–49, PageID # 223–24.

Bayer and Merial expressed concern about the district court's proposed evidentiary plan.  They stated that "it seems like what we're having here is almost a trial simply with comments by counsel, and no witnesses and no evidence[.]" *Id.* at 43, PageID # 218.  Bayer and Merial further requested an alternative procedure, which would have involved additional briefing on the scientific issues as well as expert affidavits.  The plaintiffs' attorney objected to Bayer and Merial's suggestion, and was reluctant to adopt this alternative procedure:

> MR. CLIMACO [counsel for plaintiffs]: Your Honor, it just seems to me that all we're doing [if the alternative procedure is accepted] is opening up full-scale discovery.
>
> JUDGE POLSTER: Yeah. I don't quite understand.

MR. CLIMACO [counsel for plaintiffs]: Neither do I. Let's do the test.

*Id.* at 46, PageID # 221.

The district court memorialized the agreement reached at the case management conference in an order filed the following day. According to the case management order, the case centered on Bayer and Merial's alleged "false or misleading claims in the marketing and sales of their flea-and-tick products[.]" R. 17, 05/02/12 Dist. Ct. Order at 1, PageID # 237. Under the case management plan, Bayer and Merial would bear the initial burden, and be required to produce studies that substantiated their advertising claims.[1] *Id.* Following this step, the plaintiffs would have to "refute the studies, *e.g.*, showing how they are unreliable, inaccurate, or incomplete, or these cases will be dismissed." *Id.* Bayer and Merial filed a motion for reconsideration, objecting to the case management plan. R. 19. Plaintiffs filed a response in opposition, quoting the district court's statements at the case management conference at length, and vigorously defending the case management plan. R. 24, Resp. in Opposition at 11, PageID # 728. For example, plaintiffs argued that the plan would "sav[e] both sides considerable time, effort, and money," was within the district court's authority to enter, and "comport[ed] with the goal of achieving the orderly and expeditious disposition of cases."

On May 15, 2012, Bayer and Merial submitted several studies in support of their advertising claims. These studies included Bayer's "Chopade Study," a peer-reviewed study which applied Bayer's product on dogs, and tested dog hair and skin samples for distribution of the product's active ingredient. It also included Merial's "Dyk Study," a doctoral dissertation that topically applied Merial's product on dogs, and tested dog hair samples for distribution of the product's active ingredient.

On July 11, 2012, plaintiffs filed a motion for an extension of time to submit their response. The plaintiffs stated that they needed only a short extension of time to complete their independent study, which was purportedly necessary because the plaintiffs believed that the studies submitted by Bayer and Merial did not actually test for translocation. The district court "begrudgingly" granted the motion for an extension, but in so doing noted that the wording in

---

[1]The case management plan further provided that if Bayer and Merial did not have sufficiently recent studies, a neutral laboratory would be utilized.

plaintiffs' motion suggested that the plaintiffs were "not doing what they are supposed to, which is to attack Defendants' studies by showing they are flawed or unreliable or inaccurate." R. 32, 07/13/12 Dist. Ct. Order at 1–2, PageID # 790–91.

On July 31, 2012, the plaintiffs submitted their response, which included information provided by one of the plaintiffs and his adolescent son in what plaintiffs called the "Gregg Study," which allegedly tested the "hypothesis of pesticide distribution" concerning one of the products' active ingredients. The response also included information concerning the "Jones Study," which purported to test the advertising claims made by Bayer and Merial. The Jones Study was an independent examination of whether translocation occurred when Bayer and Merial's products were applied to a dog's skin, and included, among other things, the measure of the product found on the dog's skin, hair, and in its bloodstream at different time intervals. Because it detected a presence of the product's active ingredient in the dog's bloodstream, the study asserted that it undermined the conclusion in Bayer and Merial's studies. The plaintiffs' study did not specifically attack the basis of Bayer and Merial's studies; however it did claim that Bayer and Merial's studies reached an incorrect conclusion, and that the protocol utilized in Bayer and Merial's studies was inferior to the protocol used in plaintiffs' study.

Following the plaintiffs' submission, the district court conducted two conferences via telephone with the parties. On August 13, 2012, the district court noted that the studies produced by Bayer and Merial demonstrated that they had a "good faith basis" for making their advertising claims of translocation. R. 45-2, 08/13/12 Conf. Tr. at 3, PageID # 1175. The district court proposed ways to settle the case instead of continuing lengthy and protracted litigation. In so doing, the district court suggested that some minor adjustments in Bayer and Merial's advertising might be appropriate in light of the fact that some advertising claims were not fully supported by Bayer and Merial's studies. The district court also suggested that the parties jointly commission a neutral study and accept the results of that study as a final resolution of the case.

On September 4, 2012, the district court held another status conference. The parties indicated that they had not reached a settlement. In particular, Bayer and Merial were not interested in pursuing the district court's suggestion of a neutral study in light of the district court's May 2 order indicating that the neutral study would only be necessary in the event that

Bayer and Merial could not produce studies substantiating their advertisement claims. The district court noted that it had "ruled that [Bayer and Merial's] studies do" substantiate their claims, and that the plaintiffs did not show why the defendants were not "permitted to rely on their own studies" in making their claims, or, put differently, why the defendants did not have a "good faith basis" to rely on their studies. R. 44, 09/04/12 Conf. Tr. at 5, 7, PageID # 1124, 1126. The district court then instructed Bayer and Merial to file a summary judgment motion, indicated that the plaintiffs might be entitled to limited discovery to respond to the motion, and explained that it would decide whether the case went forward from there.

On October 3, 2012, Bayer and Merial filed a joint motion for summary judgment. In response, the plaintiffs filed a Rule 56(d) Motion for Discovery, which the district court ultimately granted, but only in part. The district court noted that the plaintiffs' motion for discovery was "broad" and involved "30 pages of interrogatories, a 25-page request for production of documents addressed to Defendant Merial, a 23-page request for production addressed to Defendant Bayer" and several depositions. R. 49, 11/07/12 Dist. Ct. Order at 1, PageID # 1888. The district court referenced the case management plan, noting "[t]he Court has said from the beginning—and Plaintiffs have always agreed—that this is a false advertising case. Accordingly, the question is . . . . whether the Defendants have substantial support for their product advertisements" and not whether the products "actually work on each and every pet." *Id.* at 1–2, PageID # 1888–89. The district court thus denied all but plaintiffs' request for consumer complaints on the basis that evidence that the companies had received a large volume of consumer complaints would call into question Bayer and Merial's good faith reliance on their studies.

On March 19, 2013, the district court granted Bayer and Merial's joint motion for summary judgment. In the order, the district court noted that the case management plan provided for limited discovery and briefing, and noted also that Bayer and Merial produced studies that substantiated their advertising claims. The district court observed that Bayer and Merial received an insignificant number of consumer complaints concerning their products, and that the plaintiffs at that point were attempting "to recast the issue" as one focused on whether the defendants' products entered the bloodstream of pets, an argument that the district court dismissed as a "red herring." R. 62, 03/19/13 Dist. Ct. Order at 3, PageID # 2201. The district

court stated that the presence of some of the product in the pet's bloodstream was immaterial as to whether Bayer and Merial had "reliable, accurate, and complete scientific studies to back up their dispersion claims," and whether they had a good faith basis for making those claims. *Id*. at 4, PageID # 2202.  The district court granted the defendants' motion for summary judgment. This appeal followed.

## II.

We first address the plaintiffs' complaints concerning the district court's case management plan, which in turn affects the plaintiffs' contentions that the district court did not address the entirety of their claims, afford them sufficient discovery, or properly apply the standard for summary judgment. This court "typically review[s] a district court's case-management decision made pursuant to Rule 16 for abuse of discretion." *Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 252 (6th Cir. 2000).[2]  Bayer and Merial note that the plaintiffs expressly agreed to the case management plan suggested by the district court at the May 1 case management conference, in which the district court described the plaintiffs' four claims as really constituting only one claim.  Bayer and Merial further note that the plaintiffs expressly agreed to the evidentiary plan suggested by the district court and that, in particular, the plaintiffs expressed reservations about opening up full-scale discovery.  Bayer and Merial thus claim that plaintiffs are bound to their express agreement with the district court's case management plan.  This claim depends on whether it is appropriate to apply the related doctrines of waiver and invited error to the circumstances of this case.

"Waiver is the intentional relinquishment or abandonment of a known right." *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006).  *Williams v. Nashville Network*, 132 F.3d 1123 (6th Cir. 1997) (per curiam), serves as an example of this court finding that a party waived his rights and so could not later claim that the court erred.  A plaintiff claimed that the district court had violated the Seventh Amendment by allowing the jury to reach a majority verdict.  This court declined to review the claim because the plaintiff "explicitly agreed at trial,

---

[2]Rule 16(a) provides "(a) Purposes of a Pretrial Conference. In any action, the court may order the attorneys and any unrepresented parties to appear for one or more pretrial conferences for such purposes as: (1) expediting disposition of the action; (2) establishing early and continuing control so that the case will not be protracted because of lack of management; (3) discouraging wasteful pretrial activities; (4) improving the quality of the trial through more thorough preparation; and (5) facilitating settlement." Fed. R. Civ. P. 16.

on several occasions, to proceed with a majority verdict." *Id.* at 1128. Thus, because the plaintiff agreed with the judge's course of conduct, he waived his right to later charge the court with error in following that course of conduct. *See id.*

Similarly, the "doctrine of invited error is a branch of the doctrine of waiver by which courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside." *Harvis v. Roadway Exp., Inc.*, 923 F.2d 59, 61 (6th Cir. 1991) (internal quotation marks omitted). In particular, the doctrine of invited error prevents a party from inducing a court to follow a course of conduct and then "at a later stage of the case us[ing] the error to set aside the immediate consequences of the error." *Id.* at 61. A court refuses a party relief for an invited error based on the "principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Id.* at 60. This court has described the doctrine of invited error as a "cardinal rule of appellate review," and has noted that courts apply the invited error doctrine to "a wide range of conduct[,]" including issues concerning a party's burden of proof, the submission of evidence, and the exclusion of evidence. *Id.* at 60–61.

The case *Harvis v. Roadway Express, Inc.* serves as an example of an invited error for which a party could not later obtain relief. *See id.* In *Harvis*, a plaintiff requested a jury trial for a race discrimination claim under 42 U.S.C. § 1981, and the jury eventually returned a verdict for the defendant. *See id.* at 60. The district court also entered judgment in favor of the defendant on the plaintiff's Title VII claim, finding it barred in light of the jury's resolution of the plaintiff's § 1981 claim pursuant to collateral estoppel. *See id.* On appeal, seeking to evade the collateral estoppel effect of the jury verdict, the plaintiff argued that his § 1981 claim should never have gone to a jury. In refusing relief, this court noted that the plaintiff requested the jury trial in the first place and thus "invited the error of a jury verdict in his case." *Id.* at 61 (internal quotation marks omitted). This court concluded that, because the plaintiff did not "demonstrate[] why he should not be bound by the so-called 'error' he induced the [d]istrict [c]ourt to make[,]" this court on review would not relieve him of the consequences of that error (assuming that there was error). *Id.* at 61–62.

In an attempt to avoid application of the doctrines of waiver or invited error, the plaintiffs argue that their position that they should be "entitled to discovery" was "clear" to the district court; however, this argument is undercut by an examination of the transcript from the case management conference.   Admittedly, when read in isolation, statements by the plaintiffs' counsel suggest a desire for discovery separate from that contemplated by the case management plan. *See, e.g.*, R. 16, 05/01/12 Tr. at 19, PageID # 194 ("It would also be helpful for us to have the testing that the company did for the experts to evaluate.").   But read in the context of the entire case management conference, the better inference is that the parties and the court initially discussed the sort of information that would be helpful in resolving the case, and then ultimately agreed to an evidentiary plan that they felt reflected their needs. *See, e.g., id.* at 48–49, PageID # 223–24 ("JUDGE POLSTER: . . . So do plaintiffs agree with the [evidentiary plan]?  MR. CLIMACO [counsel for plaintiffs]: Yes, we do, Your Honor.").   The plaintiffs' arguments are further undermined by the district court's case management order, which memorializes the evidentiary plan, and to which the plaintiffs did not object.

Considering the facts of this case in light of these doctrines, it is clear that plaintiffs did indeed "agree in open court with [the district] judge's proposed course of conduct and [now] charge the court with error in following that course." *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002).   On multiple occasions, counsel for plaintiffs agreed in open court with the district court's framing of the case as a single-issue case.   They also agreed in open court with the district court's proposed evidentiary plan.   And they failed to object to the case management order and, in fact, vehemently opposed the defendants' motion for reconsideration of the order.   Moreover, although they gave up discovery and some of the claims in the case, they got something in return.   They no longer shouldered the initial burden of disproving the defendants' advertisements; the defendants instead shouldered the initial burden of substantiating them.   Therefore, even if the district court committed error in framing the case around a single issue or in crafting an evidentiary plan, plaintiffs invited that error and they have waived their right to charge the district court with error on appeal. *See id.*; *Harvis*, 923 F.2d at 60–61.

## III.

Plaintiffs next argue that the district court did not provide them with an opportunity to engage in the discovery necessary to respond to Bayer and Merial's motion for summary judgment. This court reviews a district court's decision on a Rule 56(d) motion for discovery for an "abuse of discretion." *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 862 (6th Cir. 2005). "A district court does not abuse its discretion in denying discovery when the discovery requested would be irrelevant to the underlying issue to be decided." *Id.* Moreover, "district courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 457 (6th Cir. 2008).

In its denial of most of the plaintiffs' discovery requests, the district court noted that the plaintiffs' motion for discovery was "broad" and involved "30 pages of interrogatories, a 25-page request for production of documents addressed to Defendant Merial, a 23-page request for production addressed to Defendant Bayer," and several depositions. R. 49, 11/07/12 Dist. Ct. Order at 1, PageID #1888. The plaintiffs also requested information on the ingredients in the products, other studies conducted by Bayer and Merial, regulatory compliance information, and information concerning company organizational structures. Because the parties agreed that the case turned on the issue of whether "defendants have substantial support for their product advertisements" and not whether the products "actually work on each and every pet," the district court denied all but plaintiffs' discovery request for consumer complaints on the basis that "a large volume of consumer complaints" might call into question Bayer and Merial's good faith reliance on their studies. *Id.* at 1–2, PageID # 1888–89.

We find that the district court's denial of the plaintiffs' discovery request was not an abuse of discretion in light of the fact that the plaintiffs agreed that their case turned on a single issue and agreed on an evidentiary plan designed to limit discovery by *both* parties. The plaintiffs' discovery requests relating to depositions, additional documents, and subpoenas clearly fell outside of the scope of the single issue and evidentiary plan that they agreed would govern the outcome of the case. Arguing otherwise, the plaintiffs focus on the fact that the district court denied such a large amount of its discovery request and argue that the district

court's limitation was both severe and unreasonable, but in so doing fail to acknowledge that this arrangement was one to which they agreed. Indeed, the plaintiffs expressly discouraged the court from opening up full-scale discovery at the case management conference. Thus plaintiffs' argument that their discovery requests were consistent with other run-of-the-mill discovery requests is undermined by their agreement to the case management plan. We conclude that the district court was within its discretion to deny discovery requests that exceeded the scope of the case management plan that plaintiffs expressly and repeatedly agreed was appropriate to resolve their claims. *See Aparco-Centeno*, 280 F.3d at 1088; *Harvis*, 923 F.2d at 60–61. Moreover, we note that the plaintiffs' reliance on *CenTra, Inc. v. Estrin*, 538 F.3d 402 (6th Cir. 2008), is misplaced. C*enTra* involved the question whether a party could have implicitly consented to a conflict of interest. *See id.* at 419–23. This court found that "it is not true that all conflicts are consentable," and that the plaintiff's knowledge of select pieces of information could not, as a matter of law, adequately address the scope of the conflict of interest at issue in the case. *Id.* at 413–15. We also found that the district court's complete denial of the plaintiff's motion for discovery was an abuse of discretion. *Id.* at 419–23. The court found an abuse of discretion on the basis that the "information sought . . . [was] essential to justify [the party's] opposition to summary judgment." *Id.* at 421.

But *CenTra* is factually distinguishable from this case for three reasons. First, there is no issue of implicit consent to a conflict of interest in this case, and so the same concerns are not in play. Second, in this case, the district court denied the majority of the plaintiffs' requests because the requested discovery was not meaningfully relevant to the question that the parties agreed would govern the case: whether Bayer and Merial had studies substantiating their claims, and thus a good faith basis for their advertisements. There is no basis to conclude that there was any similar agreement in *CenTra*. *See id.* at 419–23. In other words, in *CenTra*, the doctrines of waiver and invited error did not apply. *See id.* Third, unlike in *CenTra*, here the district court in fact granted the plaintiffs' discovery motion with respect to the consumer complaints, which the district court found might be helpful in evaluating whether Bayer and Merial had a good faith basis to rely on their studies in making their advertising claims. By contrast, in *CenTra*, this court's judgment was influenced at least in part by the fact that the party had been given no opportunity for discovery. *See id.* at 423 ("CenTra was given no opportunity for discovery,

which suggests . . . that the district court abused its discretion.").  Therefore, we find no abuse of discretion in the district court's partial denial of the plaintiffs' motion for discovery because the requested discovery went outside the scope of the single issue that the plaintiffs agreed determined the outcome of their case.

## IV.

Plaintiffs next argue that the district court misapplied the standard for summary judgment.  This court reviews "an order granting summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the non-moving party."  *Ky. Commercial Mobile Radio Serv. Emergency Telecomms. Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, 912 (6th Cir. 2013).  Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Summary judgment is thus appropriate when there is "no genuine issue as to any material fact[.]"  *Id.* at 323.  In reviewing a motion for summary judgment, "the non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotation marks omitted).

The district court referenced the case management plan in granting summary judgment to Bayer and Merial, noting that Bayer and Merial produced studies substantiating their claims that their products spread across a pet's body after topical application.[3]  Because the plaintiffs did not refute these studies by showing that they were unreliable, inaccurate, or incomplete, and because there were not enough consumer complaints to put Bayer and Merial "on notice" that their studies may be flawed, the district court found that plaintiffs did not meet their burden.  The district court then granted summary judgment to Bayer and Merial, reasoning that the plaintiffs failed to cast doubt on Bayer and Merial's good faith reliance on their studies.  We agree.

---

[3]The plaintiffs note that the district court expressed concern during the status conference that select advertising claims might not be fully supported by Bayer and Merial's studies, and argue that, by doing so, the district court signaled a return to conventional litigation.  While it is true that the district court made this observation and proposed alternative ways of settling the case, we see no basis to conclude that the case management plan no longer applied in the event that the parties did not settle.

Under the terms of the case management plan, it is clear that Bayer and Merial met their burdens, but that the plaintiffs did not. Both Bayer and Merial submitted multiple studies, several of which were published or peer reviewed, that substantiated their advertising claims. For example, Bayer's "Chopade Study" involved two studies which tested whether the active ingredient in Bayer's products spread across a dog's body after topical application. As part of the study, skin biopsy samples were taken seven, fourteen, twenty-eight, and fifty-six days after the dog was treated with the product. The presence of the product's active ingredient was detected in the skin samples at all intervals in both studies, and was also detected in the dogs' hair. Therefore this study demonstrated that the product "migrated from the application sites . . . to areas of skin and haircoat" of the dogs. R. 20-1, Chopade Study at E9, PageID # 279. Another example is Bayer's "Dyk Study," which used two methods to test for the active ingredient in Bayer's products on dog hair clippings, which in turn would demonstrate whether the product spreads by translocation by "wicking" across the pet's hair. The study found that the hair clipping measurements supported claims of "translocation away from the application site to other areas on the animals" up to twenty-four hours after topical application. R. 21-2, Dyk Study at 103, 106. Because Bayer and Merial met their burden and demonstrated that they had studies to substantiate their claims, the plaintiffs were required to refute their studies and demonstrate that Bayer and Merial did not in fact have a good-faith basis for their advertising claims. The plaintiffs' "Jones Study," which was not peer-reviewed, asserted that Bayer and Merial's products did not spread via translocation. The study detected the products' active ingredients in the pets' bloodstream, which when considered in isolation might suggest that the products spread internally rather than by translocation, but also detected the products' active ingredients in the pets' hair twenty-four hours after application. The study asserted that its protocol was superior to the protocol used in Bayer and Merial's studies, but it did not attack the *basis* of Bayer and Merial's studies. Viewing the evidence in the light most favorable to plaintiffs, the parties' studies at best conflict with one another. However, this conflict fails to establish that Bayer and Merial were not entitled to rely on their studies in making their advertising claims, as the plaintiffs were required to show pursuant to the case management plan. The mere assertion that Bayer and Merial's studies were wrong surely does not rise to the level of "refuting" them. As Bayer and Merial met their burdens and the plaintiffs did not, summary judgment for Bayer and Merial was appropriate.

The plaintiffs argue that the veracity of Bayer and Merial's claims, rather than merely whether Bayer and Merial had a good faith basis for making their claims, was before the court at the summary judgment stage of the proceedings. But this argument ignores the language of the district court's case management order as well as the burden-shifting process outlined in the case management plan. The district court's case management order noted that this case revolved around whether Bayer and Merial "make false or misleading claims in the marketing and sales of their flea-and-tick products" and established an evidentiary plan to determine whether Bayer and Merial had a good faith basis for their advertising claims. R. 17, 05/02/12 Dist. Ct. Order at 1, PageID # 237. Therefore the initial burden was assigned to Bayer and Merial, rather than to the plaintiffs. By having Bayer and Merial submit studies to "substantiate" their claims, the district court effectively required Bayer and Merial to demonstrate that they had a good faith basis for making their advertising claims. *Id.* And by requiring Bayer and Merial to produce the studies which formed the basis for their advertising claims, rather than require the plaintiffs to submit wide-ranging discovery requests, the district court was able to avoid extensive discovery costs, which was one of the objectives of the case management plan. Only if Bayer and Merial could demonstrate that they had a good faith basis for making their claims would the burden shift to the plaintiffs, who would then have to "refute [Bayer and Merial's] studies [by] showing how they are unreliable, inaccurate, or incomplete." *Id.* at 2, PageID # 238. By requiring the plaintiffs to submit studies that demonstrated why Bayer and Merial's studies did not provide a good faith basis for their claims, the district court was able to avoid a "battle of the experts" and the attendant costs, which was another objective of the case management plan.

The case management plan's burden-shifting process would not be sensible if the case turned on the veracity of Bayer and Merial's claims, because if veracity was the central issue in the case, one would expect the plaintiffs to bear the initial burden of showing that Bayer and Merial's claims are false. Rather, the central issue was whether the plaintiffs could cast doubt on Bayer and Merial's good faith basis for their advertising claims through expert studies. This conclusion is further supported by the July 13 order granting plaintiffs an extension of time, which notes that the plaintiffs must discredit Bayer and Merial's studies in order to meet their burden. We owe deference to the district court's interpretation of its own order. *See Kendrick v. Bland*, 931 F.2d 421, 423 (6th Cir. 1991). The plaintiffs' studies did not attack the basis of

Bayer and Merial's studies; they merely asserted an opposing conclusion. As the case management plan turned on the good faith basis for Bayer and Merial's claims rather than their veracity, the plaintiffs' studies fell short, and summary judgment for Bayer and Merial was appropriate.

In further arguing that summary judgment for Bayer and Merial was error, plaintiffs again allege that they were not provided with a sufficient opportunity for discovery, and note that grants of summary judgment are generally improper when a party has not been provided with an adequate opportunity for discovery. *But see Ball v. Union Carbide Corp.*, 385 F.3d 713, 719–20 (6th Cir. 2004) (finding no abuse of discretion in a district court's denial of a discovery request because it was unclear how the discovery would "shed further light" on the dispositive issue). The plaintiffs' argument is flawed in that the authorities they cite, while providing a guide as to general summary judgment procedure, do not address circumstances in which a party agrees to a district court's case management plan and then attempts to renege on that agreement. *See Aparco-Centeno*, 280 F.3d at 1088; *Harvis*, 923 F.2d at 60–61. The plaintiffs' case authority is further unhelpful because the cited cases stand for the proposition that error is found in circumstances in which a district court permits *no* discovery, and such circumstances are not at issue in this case. *See CenTra*, 538 F.3d at 423; *Vance v. United States*, 90 F.3d 1145, 1147–49 (6th Cir. 1996). As a result, these cases are of limited help in explaining why the plaintiffs should not be bound to the case management plan for purposes of summary judgment.

We conclude that Bayer and Merial produced studies substantiating their claims, thus demonstrating that they had a good faith basis on which to base their advertisements. Pursuant to the case management plan, plaintiffs were then required to produce studies that refuted Bayer and Merial's studies. Plaintiffs instead submitted studies testing independent hypotheses that, even when viewed in the light most favorable to the plaintiffs, only suggest that the studies conflict, rather than show that Bayer and Merial's studies are unreliable, inaccurate, or incomplete. Under the terms of the case management plan, the plaintiffs' case should be dismissed, and the plaintiffs' arguments concerning general summary judgment practices do not convince us otherwise. We therefore affirm the district court's grant of summary judgment to Bayer and Merial.

## V.

Finally, plaintiffs argue that the district court erred by not conducting any *Daubert* analysis. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court outlined "the standard for admitting expert scientific testimony in a federal trial." 509 U.S. 579, 582 (1993). Under *Daubert*, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. Plaintiffs argue that the district court accepted Bayer and Merial's studies without conducting a *Daubert* analysis to ascertain whether the reports were reliable pursuant to Federal Rule of Evidence 702.

We observe, however, that the plaintiffs present their *Daubert* challenge for the first time on appeal. "Generally, an argument not raised before the district court is waived on appeal to this Court." *City of Columbus, Ohio v. Hotels.com, L.P.*, 693 F.3d 642, 652 (6th Cir. 2012). Exceptions to this general rule are narrow, and are not considered unless "failure to consider the issue will result in a plain miscarriage of justice." *Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Under the terms of the case management plan, the single issue was whether Bayer and Merial's studies substantiated their claims so as to establish a good faith basis for their advertisements, not whether those studies were admissible in court to prove some issue of fact. Plaintiffs agreed to this plan and never presented their challenge before the district court. We therefore find that no "miscarriage of justice" within the meaning of this court's precedent occurred, and hold that the plaintiffs forfeited any *Daubert* challenge. *See Overstreet*, 205 F.3d at 578.

## VI.

The doctrines of waiver and invited error preclude plaintiffs' arguments that go to the heart of the case management plan. In light of the case management plan, therefore, we conclude that the judgments of the district court must be **AFFIRMED**.