RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0039p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
―――――――――――

JAMES SMITH, et al.,

        *Plaintiffs-Appellants*,

     *v.*

GENERAL MOTORS LLC,

        *Defendant-Appellee*.

> No. 19-1614

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-14146—Laurie J. Michelson, District Judge.

Argued: February 5, 2020

Decided and Filed: February 18, 2021

Before: SUHRHEINRICH, STRANCH, and NALBANDIAN, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:** Jason H. Alperstein, ROBBINS GELLER RUDMAN & DOWD LLP, Boca Raton, Florida, for Appellants. James C. McGrath, SEYFARTH SHAW, LLP, Boston, Massachusetts, for Appellee. **ON BRIEF:** Jason H. Alperstein, Mark J. Dearman, ROBBINS GELLER RUDMAN & DOWD LLP, Boca Raton, Florida, E. Powell Miller, Sharon S. Almonrode, THE MILLER LAW FIRM, PC, Rochester, Michigan, Caroline F. Bartlett, CARELA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C., Roseland, New Jersey, for Appellants. James C. McGrath, SEYFARTH SHAW, LLP, Boston, Massachusetts, Robyn E. Marsh, SEYFARTH SHAW, LLP, Chicago, Illinois, for Appellee.

     NALBANDIAN, J. delivered the opinion of the court in which SUHRHEINRICH, J., joined. STRANCH, J. (pp. 20–23), delivered a separate opinion concurring in the judgment.

---

**OPINION**

---

NALBANDIAN, Circuit Judge. It is cliché for a court to note that a case is odd. But the moniker is appropriate here—where the parties seem to ignore the fundamental question of governing law. Congress commands that we apply the law of the "several states" in this diversity action. That task, though, is made difficult here because the parties eschew their obligation to set forth what that law is.

Plaintiffs' multi-state class action suit alleges that General Motors, LLC (GM) knowingly sold them vehicles with defective dashboards. According to Plaintiffs, that defect produces dashboard cracking that could cause severe injuries because malfunctioning airbags could turn the plastic dashboards into deadly projectiles during a crash. But no class member, or any other GM customer, experienced that dangerous scenario. At worst, Plaintiffs suffered only cosmetic damage and a potential reduced resale value from owning cars with cracked dashboards. Even still, Plaintiffs contend that GM knew about the defect and its dangers. And they believe that is enough to justify relief.

This case turns on what, exactly, Plaintiffs must plead to survive a motion to dismiss. They assert that routine testing, customer complaints, and increased warranty claims alerted GM to the defective dashboards and accompanying danger. But that is not enough to move forward absent some specifics about how and when GM (1) learned about the defect and its hazards, and (2) concealed the allegedly dangerous defect from consumers when selling cars. Even accepting that GM produced defective vehicles, under the common legal principles of the several states, Plaintiffs must show that GM had sufficient knowledge of the harmful defect to render its sales fraudulent. And Plaintiffs did not allege particular facts showing that GM fraudulently unloaded unsafe vehicles onto an unwitting public. Much like Sir Conan Doyle's case of the dog that did not bark, this dispute centers on what we can infer from shrapnel that did not spray. And, absent more detailed pleading about GM's knowledge, there is not enough showing that GM learned about, and ignored, the allegedly dangerous defect. So we **AFFIRM**.

I.

Between 2005 and 2006, GM changed the dashboard used for GMT900 model cars from a multi-piece design to a single-piece design. This change made the dashboard prone to cracking in two places. Plaintiffs, who reside and bought GM vehicles in many states, allege that GMT900 vehicles produced between 2007 and 2014 contained a faulty, dangerous dashboard.[1] This line of vehicles contains some of the most popular cars in America, such as the Chevrolet Silverado, the GMC Sierra, the Chevrolet Tahoe, and the Cadillac Escalade. Fixing dashboard cracks can cost up to $1,800. Even worse, the design change allegedly created a safety hazard— a crack near the steering column that could lead to an airbag malfunction or shrapnel spray during a crash. But GM never recalled GMT900 dashboards or publicly disclosed this defect.

Plaintiffs allege that GM first learned about the dashboard defect during the pre-production testing stage. Automotive industry standards suggest that car manufactures use a Production Part Approval Test (PPAT) when redesigning vehicles. This test allows car manufacturers to identify and remedy "potential failure modes and their associated causes/mechanisms." (R. 14, Am. Compl., PageID 576.) It follows that GM likely submitted the defective dashboard used in the GMT900 series to a PPAT. Plaintiffs alleged that during that test, GM would have learned that panel cracking could lead to serious hazards for drivers, including "adverse deployment of the passenger side airbag" and "sharp shards of flying debris inside the vehicle." (*Id.* at 581.) Relying on information and beliefs about automobile industry standards and the requirements of pre-production testing, Plaintiffs thus assert that GM knew of the defective dashboards before GTM900 vehicles hit the market.

After greenlighting the GTM900 series for mass production and sales in 2007, GM received customer complaints about those cars beginning in 2009. For instance, drivers complained about cracked dashboards on websites like ChevroletForum.com. By monitoring these forums, GM could have learned about the defective dashboards. Around the same time, complaints about cracked dashboards began to increase on the National Highway Traffic Safety Administration (NHTSA) website. These included 1,589 complaints about GMC and Chevrolet

---

[1]Because this case comes during the motion to dismiss stage, we treat the facts Plaintiffs alleged in their complaint as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

cars with the words "dashboard" and "crack" in the description. (*Id.* at 587.) And 1,138 complaints came from GMT900 series cars, 240 of which asserted the dashboards were unsafe. One complaint voiced a concern that the defective dashboard could become hazardous during a crash by creating shrapnel. In a similar vein, GM saw a rise in warranty claims and complaints relating to GMT900 vehicles.[2]

Most of the complaints, however, related to cars driven for many years and many miles (another potential reason against warranty coverage). And all of the named Plaintiffs complained about defects in vehicles driven between 23,000 and 156,000 miles over multiple years.

What is more, Plaintiffs' complaint contains no allegation that any of them have been hurt by the allegedly defective dashboards. It only theorizes that "[t]he [dashboard] cracks *can* interfere with the planned deployment of the passenger side airbag, thus creating a safety risk." (*Id.* at 567 (emphasis added).) And Plaintiffs confirmed that they did not have evidence showing that the dashboard's alleged safety defect ever caused an injury to anyone driving or riding in a GMT900 series car.

Plaintiffs (who hail from twenty-five states) sued GM on behalf of themselves and a nationwide class in the Eastern District of Michigan, alleging that GM should be liable for fraudulent concealment and unjust enrichment, violated state consumer protection statutes, and skirted the Magnusson-Moss Warranty Act. GM moved to dismiss the suit, relying heavily on *Mross v. Gen. Motors Co.*, No. 15-C-0435, 2016 WL 4497300 (E.D. Wis. Aug. 25, 2016), a case in which different consumers had sued GM over the same dashboard defect. There, applying common legal principles, the district court explained that "for all named plaintiffs to have viable fraud claims, the complaint must adequately allege that GM knew . . . both that the dashboards were likely to crack and that this defect posed the safety concerns alleged in the complaint" before they had purchased their vehicles. *Id.* at *5.

---

[2]GM's warranty offers "bumper-to-bumper" coverage for three years or 36,000 miles (whichever comes first). (*Id.* at 622–23.) But Plaintiffs allege that GM would not fix the dashboard because it stated that the cracked dashboard was a cosmetic issue not covered under warranty.

In response to GM's motion, Plaintiffs "also urge[d]" the district court "to follow *Mross*" because they believed that case "actually support[ed] the viability of [their] claims." (R. 32, Resp. to Mot. to Dismiss, PageID 1382.) And they quoted *Mross*'s finding that a "viable fraud claim[] . . . complaint must adequately allege that GM knew . . . both that the dashboards were likely to crack and that this defect posed the safety concerns alleged in the complaint" before sale. 2016 WL 4497300, at *5. But later in their response, Plaintiffs argued that they were "Not Required to Plead GM's Knowledge of the Safety Risk" because "[k]nowledge of the defect is sufficient" so "knowledge of the safety risk is unnecessary." (R. 32, Resp. to Mot. to Dismiss, PageID 1400.) Then, in the alternative, they argued that "even if it were required, Plaintiffs have pled GM's knowledge of the safety risk." (*Id.*)

The district court held a hearing in February 2019 on GM's motion. After hearing argument, the district court ruled in GM's favor. It noted that Plaintiffs had sent mixed signals about what they believed the law required them to plead: "Plaintiffs suggest they do not need to plead that GM had knowledge of the safety issue, but at the same time, they ask the Court to follow *Mross*." (R. 44, Tr. Mot. to Dismiss, PageID 1550.) The court noted that "[t]hey cannot have it both ways." (*Id.*) And, "[a]pplying *Mross*," it ruled that "plaintiffs need to plead facts that make it plausible to in[fer] that GM knew of the safety issue." (*Id.*) And it determined that Plaintiffs' allegations about pre-production testing and customer complaints were not enough to support an inference that GM knew about the alleged safety risk related to the dashboard cracks. So the district court dismissed Plaintiffs' claims because they failed to show that GM had the requisite knowledge.

This appeal followed in which "Plaintiffs appeal only the dismissal of their fraudulent concealment, state statutory consumer protection, and unjust enrichment claims." (Appellants Br. at 11.)

II.

To survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Boland v. Holder*, 682 F.3d 531,

534 (6th Cir. 2012) (citation omitted). We review dismissals for failure to state a claim de novo. *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014). And in doing so, we consider all factual allegations to be true and construe inferences in the light most favorable to plaintiffs. *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013).

III.

Plaintiffs asserted fraudulent concealment, unjust enrichment, and consumer protection claims below, and they now challenge the dismissal of those claims on appeal. The district court dismissed these claims because it ruled that Plaintiffs had failed to adequately plead that GM knew the dashboard defect posed a safety risk prior to sale of the vehicles. It determined that Plaintiffs needed to plead knowledge of the safety risk for all three claims based on how Plaintiffs had responded to GM's motion to dismiss. And it concluded that they had failed to do so.

Presumably because the district court dismissed each of these claims under the same knowledge standard, Plaintiffs do not attempt to meaningfully distinguish their three claims on appeal except as described below in Part IV.B. Rather, they simply argue that the district court erred in requiring them to plead knowledge of the safety risk as opposed to mere knowledge of the defect coupled with existence of a safety risk. In the alternative, they argue that they adequately pled that GM knew about the safety risk.

Their arguments thus rest on the assumption that each claim is governed by a single generalized legal standard for purposes of this appeal, which means two things. First, it means that each claim rises or falls with the other two claims. Second, it means that their briefing assumes the law about whether knowledge of a safety risk is required for each of the three claims is materially identical throughout the country. But Plaintiffs present their case without providing citations to support these two underlying assumptions. And that is troubling because it highlights that Plaintiffs have failed to specify which jurisdiction's laws, federal or otherwise, govern their suit.[3] And that failure implicates *Erie* and the Rules of Decision Act.

---

[3]To be sure, Plaintiffs pointed to specific state laws in their complaint for some claims for the named plaintiffs based on their respective home states. But Plaintiffs have not appealed some of those claims. And, more

Because we are bound by both, we first address Plaintiffs' failure to tell us which law or laws, state or federal, govern this suit. But as explained in this section, we ultimately decide that neither prevents us from disposing of this case on the merits, and we proceed to do so in the following sections.

Plaintiffs' choice to simply rely on general tort principles rather than specify which jurisdiction's law governs their claims is odd because product liability cases often turn on specific state law requirements. *See, e.g.*, *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 938 (6th Cir. 2014) (performing a "state-by-state *Erie* analysis" for a misrepresentation-based product liability claim); *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 792–96 (E.D. Mich. 2019) (analyzing GM's knowledge of a defect to resolve fraudulent concealment claims under Illinois, Michigan, Missouri, Nevada, Ohio, Pennsylvania, and Virginia law). And parties usually specify which jurisdictions cover their diversity dispute, and then this court applies the "substantive law of the states" by either (1) following a ruling from the state supreme court, (2) following the applicable state statute, or (3) predicting how the state supreme court would rule "by looking to all available data, including decisions of the states' appellate courts." *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d at 937.

And Plaintiffs' assumption that general tort principles govern each claim also toes a dangerous line with the Rules of Decision Act and the *Erie* doctrine. By asserting that a generalized framework governs, they venture close to asking us to apply the general common law or federal common law, *see Swift v. Tyson*, 41 U.S. 1, 1 (1842), *overruled by Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), rather than "[t]he laws of the several states," Rules of Decision Act, 28 U.S.C. 1652.[4] And under the *Erie* doctrine, parties typically cannot escape the general

---

importantly, their arguments in response to GM's motion below and on appeal treat all three relevant claims as if their survival turns on the question of whether they need to plead that GM had knowledge of the safety implications of the dashboard defect.

[4]Indeed, in paragraph 183 of the complaint, Plaintiffs purport to bring their case "under the common law of fraudulent concealment." (R. 14, Am. Compl., PageID 615.) Only "in the alternative" do they bring the claim "on behalf of each State Class under the law of each state in which Plaintiffs and Class members purchased or leased the GM Vehicles." (*Id.*) The latter, "alternative," view, however, is likely compelled by *Erie* and the Rules of Decision Act where the basis of our jurisdiction is diversity.

rule that "[i]n diversity cases we apply the choice-of-law rules and substantive law of the forum state."**[5]** *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008).

Here, various state laws recognize causes of action like the claims at issue on appeal. And unsurprisingly, the state laws governing these types of claims do not appear to be completely uniform. For example, state law regarding manufacturers' duty to disclose defects appears to vary at least to some degree from state to state. *See Matanky*, 370 F. Supp. 3d at 795–98 (noting Nevada "imposes a duty to speak in certain transactions, depending on the parties' relationship[,]" whereas Pennsylvania "recognizes a duty to disclose for remote manufacturers with superior knowledge" and specifies that the defect must be "serious and life threatening" (citation omitted)).

But the district court correctly determined that it could resolve this case despite any possible (and unbriefed) differences in state law given the way the parties argued GM's motion to dismiss. And that same reason provides an avenue for us to affirm the district court's decision.

When GM moved to dismiss, it relied heavily on *Mross*, a case in which a district court confronted the same defect and alleged safety risk. 2016 WL 4497300. In that case, like this one, the parties did not "point[] to any significant differences in the laws of the states at issue," so the district court applied the Restatement (Second) of Torts, which it concluded "accurately summarize[d] the law." *Id.* at *2. That court ruled that "for the plaintiffs to state a valid claim for nondisclosure of this safety risk, they must not only allege that the risk exists (which they have done) but also allege that GM knew of the risk at or before the time the plaintiffs purchased their vehicles." *Id.* at *5. In response to GM's motion, Plaintiffs then also "urge[d]" the district

---

**[5]**It is true, of course, that even under the Rules of Decision Act and *Erie* regime, parties often choose their own law (through contractual choice-of-law clauses, for example) and that choice of law is generally waivable in litigation. *See, e.g.*, *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 393 (6th Cir. 2000) (upholding the parties' contractual choice of law provision). But that seems far different than abandoning *Erie* and the Rules of Decision Act entirely in a case like this one where they should otherwise apply. And that means that we are required to follow "the explicit command given to [us] by Congress to apply State law in cases purporting to enforce the law of a State." *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 102 (1945). And, of course, even contracts that contain choice-of-law clauses are themselves analyzed under some state's law should a controversy arise over the validity of that clause itself. *See, e.g.*, *Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383, 389 (6th Cir. 2017); *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332-33 (2d Cir. 2005).

court to apply *Mross*. (R. 32, Resp. to Mot. to Dismiss, PageID 1382.) The district court heeded that request and applied *Mross*. And we do so as well.

This choice bypasses the potentially messy choice-of-law issues described above because *Mross* concluded that state law as it related to knowledge of defects was materially uniform and accurately described in the Restatement. Because Plaintiffs (and Defendants) asked the district court to apply *Mross*, the doctrine of invited error prevents Plaintiffs from now complaining that the district court did so. *In re Bayer Healthcare & Merial Ltd. Flea Control Prod. Mktg. & Sales Pracs. Litig.*, 752 F.3d 1065, 1072 (6th Cir. 2014) ("[T]he doctrine of invited error prevents a party from inducing a court to follow a course of conduct and then 'at a later stage of the case us[ing] the error to set aside the immediate consequences of the error.'" (citation omitted) (second alteration in original)). So we refuse to conduct an exhaustive, unrequested study to determine if *Mross* got it right. Furthermore, Plaintiffs have failed to convince us otherwise on appeal. And because, as explained below, we hold that dismissal was proper under the common-knowledge requirement, we can avoid the messy choice-of-law problems ignored by the parties' briefs, and we can resolve this case under the principles that *Mross* identified. So we now proceed to the merits of Plaintiffs' arguments on appeal.

IV.

Plaintiffs first assert that the district court applied the incorrect pleading standard to dismiss their claims.[6] They make three arguments in support of this contention. First, they argue that the district court improperly required them to plead GM's knowledge of the safety risk in order to survive the motion to dismiss. Second, they argue that even if that pleading standard does govern their fraudulent concealment claim, it should not apply to their state statutory consumer protection claim. Finally, they argue that the district court misunderstood the pleading requirements under Fed. R. Civ. P. 9(b), which sets the pleading standard for "alleging fraud or mistake."

---

[6]Except as explained below in Part IV.B., Plaintiffs do not distinguish between their three claims when asserting that the district court applied the incorrect pleading standard. And given the arguments before us, we also decline to distinguish the three claims in our analysis outside of Part IV.B.

A.

Below, the district court assessed Plaintiffs' complaint using the pleading standard used in *Mross*, a case in which different plaintiffs sued GM over the same dashboard defect. The lower court did so at least partially because Plaintiffs had argued that *Mross* governed their dispute. Even so, Plaintiffs now argue that the *Mross* court (and thus the district court below) employed the incorrect pleading standard "when it required them to plead GM's knowledge of the safety risk." (Appellants Br. at 19.)

Plaintiffs point out that the procedural history is more complex than both parties simply agreeing that *Mross* provided the standard. And so we now describe precisely what happened below before rejecting Plaintiffs' argument.

In its motion, GM argued that the district court should dismiss Plaintiffs' claims because Plaintiffs had failed to allege that GM knew of the safety risk created by the defective dashboards as required by *Mross*. As we noted above, the district court in *Mross* analyzed whether plaintiffs who had asserted similar claims stemming from the same dashboard defect had stated a claim under the laws of the several states generally (looking to the Restatement as well) rather than the law of any specific state. *See* 2016 WL 4497300, at *3–4. And relying on generalizations about state tort law, the *Mross* court found that "for the plaintiffs to state a valid claim for nondisclosure of this safety risk, they must not only allege that the risk exists (which they have done) but also allege that GM knew of the risk at or before the time the plaintiffs purchased their vehicles." *Id.* at *5. So *Mross* required the plaintiffs there to show GM knew that the "defect posed the safety concerns alleged in the complaint." *Id.*

In response to GM's motion below, the district court noted that Plaintiffs had made two contradictory arguments. They had both "urge[d]" the district court "to follow *Mross*" and then later asserted that they should not be required to plead that GM knew about the safety risk associated with the dashboard defect. (R. 32, Resp. to Mot. to Dismiss, PageID 1382, 1400.) The district court noted that Plaintiffs "cannot have it both ways" and then applied the law as stated in *Mross*. (R. 44, Tr. Mot. to Dismiss, PageID 1550.)

Plaintiffs now argue that *Mross* is an outlier and urge us to ignore their request that the district court apply *Mross* and credit their other argument in response to GM's motion to dismiss—that they shouldn't be required to plead that GM knew about the safety risk associated with the dashboard defect.  In support of their argument that *Mross* misstates the law, they now point to various federal cases applying primarily California law that they claim support the idea that they should not be required to plead GM's knowledge of the safety risk.  For example, they quote *Baranco v. Ford Motor Co.* which states that "[w]hile the fact of the safety implications may be a requisite element" to survive a motion to dismiss, a manufacturer's "specific *knowledge* of a safety implication is not."  294 F. Supp. 3d 950, 962 (N.D. Cal 2018).  And they assert that even absent knowledge of the safety implications, these cases establish that GM had a duty to disclose the defect.  But these citations do not change the reality that Plaintiffs specifically "urge[d]" the district court to apply *Mross* below, thereby inviting any potential error from reliance on the standards set forth in that case.  (R. 44, Tr. Mot. to Dismiss, PageID 1482.)  And thus even accepting that some federal cases might support Plaintiffs' argument, Plaintiffs' cannot now complain that the district court applied the *Mross* standard, which clearly requires manufacturer knowledge of a defect's safety implications.

Moreover, Plaintiffs' citations to federal case law applying primarily the law of one state (California) fail to convince us that *Mross* (and by association the district court below) got it wrong.  That court concluded that "[t]he Restatement (Second) of Torts §§ 550 and 551 appear to accurately summarize the law."  *Mross*, 2016 WL 4497300, at *2.  And after analyzing the Restatement, it concluded that "for the plaintiffs to state a valid claim for nondisclosure of this safety risk, they must not only allege that the risk exists (which they have done) but also allege that GM knew of the risk at or before the time the plaintiffs purchased their vehicles."  *Id.* at *5.  This conclusion flows logically from the discussion of disclosure failures in the Restatement.

Section 551 imposes a duty to disclose "facts basic to the transaction, if [a person] knows that [another person] is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."  Restatement (Second) of Torts § 551(2)(e). The *Mross* court explained that "[i]f it is true that a cracked dashboard has the

propensity to cause personal injuries, either through interference with the airbag or causing the dash to send shrapnel through the vehicle during an accident, then it is at least plausible to consider facts about these safety risks as being basic to the transaction." 2016 WL 4497300, at *4. But it then further explained that even if such a safety risk could trigger a duty to disclose as a fact basic to the transaction, "for the plaintiffs to state a valid claim for nondisclosure of this safety risk, they must not only allege that the risk exists (which they have done) but also allege that GM knew of the risk at or before the time the plaintiffs purchased their vehicles." *Id.* at *5. This conclusion flows logically from the text of the Restatement, which only requires disclosure of facts basic to a transaction if a person "knows that [another person] is about to enter [a transaction] under a mistake as to them." Restatement (Second) of Torts § 551(2)(e). Comment c explains that § 551(2) only imposes a duty when an entity "has reason to know" the undisclosed matter will be "regarded by the other as important in determining his course of action." It is difficult to understand how GM would have known, or had reason to know, that Plaintiffs were entering into a transaction under a mistake as to the existence of a safety risk unless GM somehow knew about a safety risk.

And so it looks as if *Mross*'s ultimate conclusion that plaintiffs must plead knowledge of the safety risk flows logically from the principles described in the Restatement. Ultimately, the existence of some federal cases that that may cut the other way does not, without more, render *Mross*, which appears to correctly follow the principles outlined in the Restatement, an outlier. Based on the briefing before us, it is entirely possible that their primarily California-based cases are the outlier, not *Mross*. And so we do not hesitate to hold Plaintiffs to their request that *Mross* should govern because the Plaintiffs have both failed to show that the *Mross* standard is wrong and invited any error caused by following that standard.

Because *Mross* appears to accurately capture the law as described in the Restatement, we also note that the pleading standard applied by the *Mross* court is consistent with *Iqbal* and *Twombly*. Under the latter two decisions, a plaintiff must "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which requires the plaintiff to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And so the

*Mross* court was correct to reject "conclusory allegation[s]" and require the plaintiffs there "to generally allege that GM was aware of both the defect and the safety risk before any plaintiff purchased his or her vehicle."  2016 WL 4497300, at *3, *6.  Plaintiffs' arguments to the contrary are unpersuasive.

B.

Plaintiffs also assert that the pleading requirements below should have differed for their fraudulent concealment claim and their state statutory consumer protection claim.  They point out that consumer protection statutes require a finding that the defendant's omissions had the "capacity or tendency to deceive," which is not a fraudulent concealment element.  (Appellants Br. at 20 n.3 (emphasis omitted).)  So Plaintiffs argue that the district court wrongly ignored this distinction and thus imposed too strict a pleading standard.

Yet per Plaintiffs' request, the trial court faithfully followed *Mross* when declining to distinguish between the knowledge required for fraudulent concealment and the allegedly heightened knowledge required for state statutory consumer protection violations.  *See Mross*, 2016 WL 4497300, at *2.  Furthermore, simply labeling a trade practice as deceptive in a complaint does not pass 12(b)(6) muster—a consumer protection claim still needs to specify who was deceived and how.  *See MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 732 (6th Cir. 2007) (holding that a "conclusory allegation that the application process is 'inherently deceptive' is not enough to survive 12(b)(6) dismissal.").  So we reject Plaintiffs' position that its state law consumer protection claims should have been subject to different pleading requirements.

C.

Finally, Plaintiffs allege the district court misapplied Fed. R. Civ. P. 9(b), which sets the pleading standard for "alleging fraud or mistake" and governs state fraudulent concealment claims in diversity cases.  *See Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 562 (6th Cir. 2013) (addressing fraudulent concealment claims under Kentucky law). Rule 9(b) requires parties to "state with particularity the circumstances constituting fraud or mistake" for fraud claims but permits general allegations about the defendant's knowledge to avoid a 12(b)(6) motion to dismiss.  The adequacy of 9(b) pleadings in the face of a motion to

dismiss under 12(b)(6) are analyzed under the *Twombly*/*Iqbal* framework, which requires a plaintiff to "state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, by "pleading factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

Despite the lower court having accurately described rule 9(b)'s heightened pleading standard, Plaintiffs contend that the lower court's decision improperly imposed a "probability requirement at the pleading stage" rather than the plausibility standard. (Appellants Br. at 35.) In other words, Plaintiffs think the district court improperly rejected facts from the complaint; drew inferences in favor of GM without saying so; and wrongly required a showing that GM probably, and not plausibly, knew about the dangerous defect. For instance, they allege that the district court accepted GM's claim that no safety defect existed.

But the district court articulated the proper motion to dismiss standard—the *Twombly*/*Iqbal* "facial plausibility" requirement along with the 12(b)(6) standard of construing the complaint in the light most favorable to Plaintiffs and accepting their factual allegations as true. And the court correctly applied that standard in the context of rule 9(b).

To satisfy Rule 9(b), "the plaintiff must allege (1) 'the time, place, and content of the alleged misrepresentation,' (2) 'the fraudulent scheme,' (3) the defendant's fraudulent intent, and (4) the resulting injury." *Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007)). And the district court simply ruled against Plaintiffs because they never showed an injury or that GM had the requisite knowledge to perpetrate a fraud that covered up a dangerous defect. Although the Plaintiffs adequately pled that a defect existed, Plaintiffs did not meet their burden of showing GM's knowledge about the safety risk. For example, their complaint did not explain how Plaintiffs determined a cracked dashboard posed a safety risk—a fact that would have helped show how either party would have gained knowledge about the risk, not whether that risk existed. So the court did not misunderstand or misapply the 9(b) pleading standard.

V.

Plaintiffs also argue that even if they needed to plead knowledge of the safety risk, dismissal was inappropriate because their factual allegations raise a plausible inference of pre-sale knowledge of the safety risk.  We disagree.

Rule 9(b) imposes a heightened pleading requirement for claims alleging fraud.  That means that parties bringing a fraudulent concealment claim "must specify 'the who, what, when, where, and how' of the alleged omission."  *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012) (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006)).  And they must do so with particularity.  Fed. R. Civ. P. 9(b).  In the context of this case under the standard in *Mross*, that means that Plaintiffs needed to "state with particularity" factual allegations supporting the assertion that GM knew about the safety implications of the dashboard defect.  But Plaintiffs' allegations merely identify the dashboard defect and say the manufacturer could have theoretically known about the flaw.  And that's not enough.

Plaintiffs claim that their allegations about GM's pre-release testing, customer complaints made to the NHTSA and GM dealers, and increased warranty claims involving GMT900 vehicles support their assertion that GM knew about the safety defect.  But taken as a whole with inferences made in Plaintiffs' favor, these factual allegations do not rise above mere speculation and recitation of legal claims.  And so they are not enough to withstand a 12(b)(6) motion to dismiss.

First, Plaintiffs argue that GM knew about the dashboard defect because of pre-production testing and analysis that allegedly occurred in 2005–06.  They contend that GM learned about the defect because it assumedly "follow[s] industry-approved engineering and quality standards" every time GM makes a change to its cars.  (Appellants Br. at 6.)  Because GM changed the dashboard design for its GMT900 series, Plaintiffs insist that GM must have performed this testing "early in the design process" and uncovered the "safety risks associated with the changed design."  (*Id.*)  Yet Plaintiffs make no specific allegations about the results of the tests, such as data obtained by GM or documents confirming or suggesting whether the defect

became known. And "[j]ust because plaintiffs plead testing and the testing could reveal the safety risks alleged, does not make it plausible GM knew of the existence of these safety risks." (R. 44, Tr. Mot. to Dismiss, PageID 1552.) Indeed, Plaintiffs admitted below that they never presented any "allegation that specifically says" that pre-production testing alerted GM to the defect. (*Id.* at 1511.) And all of this confirms the district court's finding that Plaintiffs never asserted how or why testing revealed the dashboard defect or alleged that through "this testing . . . GM somehow learned that the cracked dashboard was a risk." (R. 44, Tr. Mot. to Dismiss, PageID 1550.)

The Plaintiffs disagree that allegations of pre-production testing are insufficient. And they contend that "[c]ourts throughout the country, including in this Circuit, routinely find that an automobile manufacturer's knowledge can be plausibility inferred from [pre-production testing] allegations." (Appellants Br. at 23.) But the cases cited by Plaintiffs all concern complaints that offered more than just allegations about pre-production testing. *See, e.g.*, *Weidman v. Ford Motor Co.*, No. 18-cv-12719, 2019 WL 3003693, at *6 (E.D. Mich. July 10, 2019) (finding allegations of pre-production testing sufficient when accompanied by "aggregate data from Ford dealers[] and other internal sources"); *Persad v. Ford Motor Co.*, No. 17-12599, 2018 WL 3428690, at *3 (E.D. Mich. July 16, 2018) (permitting the case to continue when the complaint contained pre-production testing allegations accompanied with "repair order and parts data received from the dealers . . . and testing performed in response to consumer complaints"). And so these cases do not undermine the dismissal of Plaintiffs' claims because the cases do not show that theoretical results from pre-production tests without accompanying verification that the tests occurred and revealed a safety defect can survive a motion to dismiss.

Next, Plaintiffs point to customer complaints to show that GM knew about the defective dashboards. They allege that "GM began to receive a flood of customer complaints" about the defect in 2009. (R. 14, Am. Compl., PageID 585.) These complaints came as online posts on car websites, such as ChevroletForum.com, and complaints on the NHTSA database about the cracks, including 239 NHTSA safety complaints related to the cracked dashboards. Plaintiffs reason that because GM monitors online car forums and the NHTSA database, it must have learned about the dangerous dashboard defect and still sold affected vehicles.

But the existence of these complaints fails to show that GM knew about the safety implications of the defect. Indeed, only one customer articulated that the cracked dashboard could lead to an unsafe deployment of airbags. And so while the complaints might have put GM on notice about the cracked dashboard, they did not create knowledge about the safety risk alleged by Plaintiffs. That is especially true because the alleged airbag malfunction has never occurred.

Furthermore, Plaintiffs only offered "information and belief" that GM knew of the complaints. (R. 14, Am. Compl., PageID 586–93.) And although complaints grounding claims on "information and belief" can survive a motion to dismiss, they "must set forth a factual basis for such belief," and plaintiffs cannot "base claims of fraud on speculation and conclusory allegations." *Sanderson*, 447 F.3d at 878 (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997)). And evidence showing the requisite knowledge for fraud cannot escape a motion to dismiss by resting on information and belief without supporting facts. *See United States ex rel. Bledsoe,* 501 F.3d at 512.

Plaintiffs' assertion that GM reads online message boards and scours the NHTSA complaint database is speculative absent any supporting facts. And that is especially true considering findings in *Roe v. Ford Motor Co.*, in which the district judge reasoned that a small number of complaints were "a blip on Ford's complaints-and-repairs radar" considering the millions of Ford cars in use. No. 2:18-cv-12528, 2019 WL 3564589, at *7. (E.D. Mich. Aug. 6, 2019). So allegations of complaints, made both online and directly to Ford, did not show Ford's knowledge of a defect in its cars. *Id.* Thus, like *Roe*, nothing shows that the complaints about GM's cracked dashboards were "frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day." *Id.* Without supporting facts that GM engaged with or received complaints about the defective dashboard and its safety risk, the consumer complaints are insufficient to allege that GM knew about the defective dashboard under the 12(b)(6) pleading standard.

Finally, Plaintiffs cite increased warranty claims as more evidence that GM knew about the defective dashboard. Their complaint alleged, upon information and belief, that GM received data in late 2009 about an uptick in warranty claims for dashboard repairs. But the warranty

claims did not show GM knew of any safety risks associated with the crack.  So even if the warranty claim spike supports that GM knew about increased dashboard repairs for GMT900 vehicles, that does not mean the warranty claims led GM to know about the hazardous airbag deployment that could accompany the cracked dashboard.  In short, Plaintiffs offer no facts showing why the warranty claims informed GM of the safety hazard rather than a mere cosmetic issue.

One last point.  Many class members allege that their dashboards did not crack until after driving their car tens (or hundreds) of thousands of miles over many years.  So it seems odd to say GM knew, at the time of sale, about a dashboard crack that developed only after a GMT900 vehicle traveled many miles over many years.  Rephrased, Plaintiffs' argument implies that GM knew about the safety ramifications of that defect when it sold the cars even though the defect took time to manifest.  That makes little sense.  For example, take *Burdt v. Whirlpool Corp.*, No. 15-01563, 2015 WL 4647929 (N.D. Cal. Aug. 5, 2015).  There, a class of plaintiffs lost on a motion to dismiss because they didn't show the manufacturer's knowledge of an oven's defect at the time of sale.  *Id.* at *2–3.  In that opinion, the district court remarked "the alleged defect did not appear until eleven months after purchase [which suggested] that the pre-release testing may not have revealed an alleged defect that only appeared after . . . extended use."  *Id.* at *4.  Here, many of the dashboard cracks cited in the complaint appeared only after extended use.  So following the sound logic in *Burdt*, Plaintiffs cannot rely on pre-production test and post-hoc complaints to show knowledge of a defect that only arose after extended use.

In sum, Plaintiffs' factual allegations fail to plausibly support their assertion that GM knew about the potential for cracked dashboards in its vehicles to explode and emit dangerous shrapnel.  To support such a claim, a complaint must contain specific facts showing the manufacturer's knowledge of the defect that it allegedly fraudulently concealed.  Mere assertions that a manufacturer's routine testing, along with customer feedback and increased warranty claims, should have alerted it to a dangerous defect are not enough to meet the 12(b)(6) pleading standard.  In similar automobile class actions that have proceeded past the motion to dismiss stage, other plaintiffs have asserted concrete factual allegations—not just speculation about what testing might have shown.  Because Plaintiffs present scant evidence that GM knew that cracked

dashboards in its vehicles might have posed a safety hazard, the district court rightly granted GM's motion to dismiss.

VI.

For the reasons stated above, we **AFFIRM**.

---

**CONCURRING IN THE JUDGMENT**

---

JANE B. STRANCH, Circuit Judge, concurring in the judgment.  I write separately to express my concerns with imposing a rule unduly saddling Plaintiffs with an additional burden at the pleading stage.

The majority opinion imposes on Plaintiffs the pleading requirements outlined in *Mross v. Gen. Motors Co., LLC*, No. 15-C-0435, 2016 WL 4497300 (E.D. Wis. Aug. 25, 2016), obliging them to "not only allege that the risk exists (which they have done) but also allege that [GM] knew of the risk at or before the time [Plaintiffs] purchased their vehicles." *Id.* at *5.  It notes that earlier in the case, the parties jointly asked the district court to adopt *Mross*'s reasoning, and so the district court did.  In light of the record in this case, I am constrained to agree that the doctrine of invited error works against Plaintiffs and ultimately resolves this case. *See In re Bayer Healthcare & Merial Ltd. Flea Control Prod. Mktg. & Sales Practices Litig.*, 752 F.3d 1065, 1072 (6th Cir. 2014); *Harvis v. Roadway Exp., Inc.,* 923 F.2d 59, 61 (6th Cir. 1991).

Still, no matter what the parties urged the district court to do, I struggle with imposing *Mross*'s unduly heightened pleading requirements on Plaintiffs.  Notably, the only case that has since cited *Mross* is the district court's opinion here.  The Seventh Circuit (the court to which the *Mross* plaintiffs could have appealed) has not clearly adopted *Mross*'s rule.  Nor have we, either before this case or as a result of it.

As Plaintiffs note, the pleading requirements differ for claims of violations of state consumer protection statutes and of fraudulent concealment.  For consumer protection claims, most state laws require plaintiffs to show only that the statements or actions have the capacity or tendency to deceive, not necessarily that they are knowing or intentional.  *See* Carolyn Carter, Nat'l Consumer Law Ctr., *Consumer Protection in the States: A 50-State Evaluation of Unfair and Deceptive Practices Laws* 29 & App'x C (2018), http://bit.ly/2DJKbGp.  Fraudulent concealment claims, including under state law, typically do not require allegations of knowledge

of safety risks. *See Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975); *see, e.g.*, Mich. Comp. Laws § 600.5855.[1] Similarly, it is unclear why Plaintiffs' unjust enrichment claims—that GM's retention of profits from vehicle sales is unjust because it knew the propensity of the dashboards to crack but did not disclose the defect—would require pleading GM's knowledge not just of the defects but of the safety risks as well. The distinction in *Mross* and the other nonbinding cases that the parties cite appears to be that the defects alleged concern potential safety risks and are not just purely cosmetic. But even fraudulent concealment claims in which the alleged defect at issue poses safety concerns do not necessarily require pleading of knowledge of the safety defect. *See e.g.*, *Krumpelbeck v. Breg, Inc.*, 491 F. App'x 713, 721–22 (6th Cir. 2012); *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 831 (S.D. Ohio 2012).

The sole authority on which *Mross* drew to impose an obligation on its plaintiffs to allege its defendants' knowledge of safety risks, as opposed to only knowledge of defects, is *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136 (9th Cir. 2012). *Mross*, 2016 WL 4497300, at *5. But *Wilson* stated no such rule. Instead, it held that the plaintiffs there had to "allege [the defendant's] knowledge *of a defect* to succeed on their claims of deceptive practices and fraud." *Wilson*, 668 F.3d at 1145 (emphasis added). Separately, it rejected the plaintiffs' claim that the defect posed a safety hazard because the plaintiffs there did not plead any facts showing a connection between the defect they alleged and the safety risk they identified. *Id.* at 1144–45. *Wilson*'s requirement to show causation is not synonymous with a requirement to show the manufacturer's *knowledge* of that causation. *See Hodsdon v. Mars, Inc.*, 891 F.3d 857, 860 (9th Cir. 2018) ("*Wilson* stands for the premise that plaintiffs in pure omission cases must plead that the undisclosed information created a safety hazard."); *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1025 (9th Cir. 2017) (citing *Wilson*, 668 F.3d at 1142–43) (outlining the test for claims for failing to disclose a defect).

---

[1]"[T]he party alleging fraudulent concealment must plead the circumstances giving rise to it with particularity. Three elements must be pleaded in order to establish fraudulent concealment: (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts."

This approach comports with decisions from this circuit. In *Krumpelbeck*, 491 F. App'x at 721–22, we addressed Ohio negligent misrepresentation and fraud claims for a defective anesthetic infusion pump, requiring the plaintiff to show the link between the defect and the safety concern but not explicitly imposing a separate requirement on the plaintiff to allege the defendants' knowledge of the safety concern. *Beck v. FCA US LLC*, 273 F. Supp. 3d 735 (E.D. Mich. 2017), for instance, applied California law and found that the plaintiff had "failed to sufficiently allege that [the defendant] had knowledge . . . of the defective [product] at the time of the sale." *Id.* at 753. Again, that is not the same as requiring the plaintiff to sufficiently allege that the defendant had knowledge of the *safety risk* that defect could pose. Also applying California law, *Porsche Cars*, 880 F. Supp. 2d at 831, evinces a similar distinction. The very district court in this case has, only months after its decisions here, stopped short of imposing the extra requirement when dealing with a variety of state laws. *Roe v. Ford Motor Co.*, No. 218CV12528LJMAPP, 2019 WL 3564589, at *5 (E.D. Mich. Aug. 6, 2019) (subsequent history omitted); *see also Francis v. Gen. Motors, LLC*, No. 19-11044, --- F. Supp. 3d. ----, 2020 WL 7042935, at *17 (E.D. Mich. Nov. 30, 2020) (collecting cases and highlighting those in which "the plaintiffs plausibly alleged that the defendant either had exclusive knowledge of a defect, or the defect allegedly implicates vehicle safety"). While alleging that the defendant has knowledge of the safety risk a defect could pose certainly bolsters a complaint's viability, *see In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1003 (E.D. Mich. 2017), it is beyond what is required to survive a motion to dismiss.

I also do not see the outlier *Mross* rule as flowing logically from the Restatement (Second) of Torts § 551(2) (Am. Law. Inst. 1977, Oct. 2020 update).[2] The Restatement is not binding, and it concerns broad principles of ultimate liability—it does not and cannot, nor does it seek to, specify federal pleading standards. Even when a Restatement provision is a "useful beginning point for a discussion of general . . . principles," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755 (1998), it should not be applied in a way that creates "perverse incentives,"

---

[2]"One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated . . . if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999). In light of the multitude of federal cases on point that do not impose the additional pleading requirement, *Mross* does not articulate an especially persuasive rule.

It bears repeating that this case comes to us at the motion-to-dismiss stage. At summary judgment, things may be different. *See Rodriguez v. Stryker Corp.*, 680 F.3d 568, 570–71 (6th Cir. 2012). It seems to me to be unfair to require Plaintiffs to plead at this point, without the benefit of discovery, that GM had knowledge of safety risks, not just that it had knowledge of defects that may pose safety risks. But I recognize that this case presents the unique circumstance of all parties requesting and then accepting application of the reasoning of *Mross*, a case involving the exact same defendant and alleged defect. As a result, I concur in the judgment.